## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

_____

In re:

Case No. 22-30690

Gleason's Gymnastic School, Inc.,
_____

### NOTICE OF HEARING AND MOTION FOR ORDERS
### (I) GRANTING EXPEDITED RELIEF AND (II) AUTHORIZING USE
### OF CASH COLLATERAL ON AN INTERIM AND FINAL BASIS

_____

TO:    The Parties Specified in Local Rule 9013-3(a)(2).

1.     Gleason's Gymnastic School, Inc., ("Debtor"), through its undersigned attorney, moves this Court for the relief requested below and give notice of hearing.

2.     This Court will hold a hearing on the Motion for expedited hearing and on the portion of this Motion seeking **interim orders** at 2:00 p.m. on May 9, 2022, in the U.S. Courthouse, Courtroom 8 West, 300 South Fourth Street, Minneapolis, Minnesota before the Honorable Katherine A. Constantine, United States Bankruptcy Judge.   A hearing on the portion of this Motion seeking a **final order** will be held at 1:00 p.m. on May 25, 2022, at the same location.

3.     Local Rule 9006-1(b) provides deadlines for responses to this Motion. However, given the expedited nature of the relief sought with respect to the portion of the Motion seeking **interim orders**, the Debtor does not object to written responses being served and filed immediately prior to the hearing.   Any response to the Motion for a **final order** must be filed and served by delivery no later than May 20, 2022, which is five (5) days before the time set for the hearing (including Saturdays, Sundays and holidays).

**UNLESS A RESPONSE OPPOSING THIS MOTION IS TIMELY FILED, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT A HEARING**.

4.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334, Fed. R. Bankr. P. 5005, and Local Rule 1070-1.  This is a core proceeding.

5.      On May 2, 2022, (the "Petition Date"), the Debtor filed a petition for relief pursuant to Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code" or the "Code").  The case is now pending before this Court.

6.      This motion arises under 11 U.S.C. §§ 105 and 363 and Fed. R. Bankr. P. 4001(b).  This motion is filed under Fed. R. Bankr. P. 9014 and 4001 and Local Rules 4001-2 and 9013-1 to 9013-3.  The Debtor requests that this Court (I) grant expedited relief and (II) enter interim and final orders authorizing the Debtor to use of cash collateral.  The grounds for this Motion are set forth below.

### RULE 4001(b)(1)(B) STATEMENT

7.      Pursuant to Fed. R. Bankr. P. 4001(b), the Debtor requests an order authorizing the use of cash collateral in which American Express National Bank holds a security interest ("Secured Party").  See Exhibit A.  The Debtor will use the cash collateral to continue their operations and reorganize in Chapter 11.  The Debtor requests interim authorization to use cash collateral through May 25, 2022, and final authorization to use cash collateral through December 31, 2022.  As adequate protection, the Debtor proposes to make monthly payments, grant the Secured Party replacement liens in the cash collateral and provide detailed monthly reports regarding cash collections and expenditures.

8.      Pursuant to Fed. R. Bankr. P. 4001(b), the Debtor requests an order authorizing the use of cash collateral in which US Small Business Administration holds a

2

security interest ("Secured Party").  See Exhibit B.  The Debtor will use the cash collateral to

continue their operations and reorganize in Chapter 11.  The Debtor requests interim

authorization to use cash collateral through May 25, 2022, and final authorization to use

cash collateral through December 31, 2022.  As adequate protection, the Debtor proposes

to make monthly payments in an amount no less than the amounts stated in the existing

loan documents between the Debtor and the Lender, see Exhibit B, grant the Secured Party

replacement liens in the cash collateral and provide detailed monthly reports regarding

cash collections and expenditures.

**BACKGROUND**

9.      The Debtor operates a gymnastic school.

10.      On the Petition Date, the Debtor filed a voluntary petition for relief pursuant

to Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  Since the

Petition Date, the Debtor has operated its business as small business debtor-in-possession

pursuant to 11 U.S.C. §§ 101(51D), 1107(a) and 1108 of the Bankruptcy Code.  No

creditors' committee or other official committee has been appointed pursuant to 11 U.S.C. §

1102 of the Bankruptcy Code.

11.      The Secured Parties claim various security interests in the Debtor and in cash

collateral of the Debtor (the "Cash Collateral").

**PRE-PETITION SECURED DEBT**

12.      As of the Petition Date, the Debtor estimates that they are indebted to

American Express National Bank in the approximate amount of $167,268.52.  American

Express National Bank filed a UCC financing statement against Debtor's Cash Collateral in

the Office of the Minnesota Secretary of State on August 31, 2018, identified as filing

number 1030270100713.   (Loan documents evidencing the debt to American Express National Bank and the UCC-1 are attached as **Exhibit A**).

13.     As of the Petition Date, the Debtor estimates that they are indebted to US Small Business Administration in the approximate amount of $150,000.  US Small Business Administration filed a UCC financing statement against Debtor's Cash Collateral in the Office of the Minnesota Secretary of State on July 20, 2021, identified as filing number 1168137301033.   (Loan documents evidencing the debt to US Small Business Administration and the UCC-1 are attached as **Exhibit B**).

## ESTIMATED COLLATERAL VALUE

14.     As of the Petition Date and as of the date the Debtor seeks authorization to use cash collateral, the Debtor estimates the following value for the Cash Collateral:

| Cash | $446,059.64 |
|------|-------------|
| Accounts Receivable | $11,816.88 |

See **Exhibit C**.

## USE OF CASH COLLATERAL

15.     The Debtor seeks authorization to use cash collateral existing as of the Petition Date, and in which the Secured Party claims an interest, in order to pay expenses in accordance with the cash flow projection/budget attached hereto as **Exhibit D** (the "Budget").

16.     The Debtor will use cash collateral to pay essential business expenses, which include: rent payments, pre-petition and post-petition wages and benefits for its employees, other payroll liabilities, utilities, insurance, and other ordinary expenses necessary to operating the Debtor's business.

17.     After the interim period, the Debtor must also have access to cash collateral to pay rent payments and administrative expense obligations, such as professional fees and United States Trustee fees, in addition to the essential business expenses referenced above.

18.     The Debtor has cash on hand and will continue to generate cash from ongoing operations.  If the Debtor is unable to use cash collateral to pay essential business expenses, and thereby operate its business, the Debtor's business will be irreparably harmed.  The Debtor will be unable to pay rent for its business location, pay for marketing and advertising, make its payroll, or otherwise pay expenses to maintain ordinary and necessary business operations.  Without virtually immediate access to cash collateral, the Debtor will not be able to provide services to its customers and the Debtor will suffer a debilitating decline in revenue and will of necessity be forced to discontinue operations.

## **ADEQUATE PROTECTION**

19.     To adequately protect the Secure Party's interest, the Debtor proposes to (i) grant the Secured Party post-petition replacement liens of the same priority, dignity, and effect as their pre-petition interests in the Debtor's Cash Collateral, and (ii) report cash collections and expenditures monthly.

20.     As described on the collateral balance projections referenced above in paragraphs 16 and 17, the Debtor projects that their Cash Collateral will stay roughly the same during the period in which the Debtor seeks authorization to use cash collateral.

21.     The Debtor's use of cash collateral will (i) allow the Debtor to continue its operation until a plan of reorganization can be confirmed; (ii) enhance the value of the Debtor's estate and its cash collateral; and (iii) increase materially the likelihood of a meaningful recovery for the Debtor's unsecured creditors.

22.     As referenced in paragraph 7 above, the Debtor is proposing to pay American Express National Bank $10,000 per month as adequate protection to ultimately be applied against its secured claim.

23.     The Debtor is proposing to pay the US Small Business Administration pursuant to the terms of the original loan whereby payments do not start until December 16, 2022 and are $731 per month.

**EXPEDITED RELIEF**

24.     The Debtor anticipates entry of a final order authorizing use of cash collateral by May 25, 2022.  As set forth in greater detail in above, without the interim use of cash collateral as proposed, the Debtor will be unable to continue operations, and the interests of creditors and others in this case will be irreparably harmed as described in paragraph 19 above and itemized Debtor's budget (Exhibit D).  Cause therefore exists to reduce notice of the hearing with respect to an interim order authorizing the use of cash collateral.

25.     The Debtor has taken reasonable steps to provide parties with the most expeditious service and notice possible under the circumstances.   Specifically, counsel for the Debtor emailed copies of the Motion to the U.S. Trustee, and all parties in interest have been served with this Motion and supporting documents.  In addition, in order to provide the most expeditious service and notice possible, the Debtor served this Motion upon American Express National Bank and has noticed American Express National Bank's attorney by email, the United States Trustee, and the US Small Business Administration, as set forth in the certificate of service.

26.     Pursuant to Local Rule 9013-2(a), this motion is accompanied by a memorandum of law, proposed order, and proof of service.

27.     Pursuant to Local Rule 9013-2, the Debtor gives notice that they may, if necessary, call Lisa Kucala, CFO of the Debtor, to testify on behalf of the Debtor about the factual matters raised in this motion.  The business address for this potential witness is: 2015 Silver Bell Road, Ste 180, Eagan, MN  55122.

WHEREFORE, the Debtor respectfully moves this Court for an order granting:

1.     An expedited hearing on this motion;

2.     Interim use of cash collateral in accordance with the Budget (Exhibit D) through and including the latter of May 25, 2022, or entry of an order following the final hearing on the Motion.

3.     Final use of cash collateral through December 31, 2022; and

4.     Such other and further relief as the Court deems just and equitable.

Dated: May 4, 2022

**THOMAS H. OLIVE LAW, P.A.**

By:  _/e/ Thomas H. Olive_____
Thomas H. Olive (ID# 14423X)
5270 W. 84th Street, Suite 300
Bloomington, MN  55437
Telephone: (952) 831-0733
Attorneys for Debtor

**<u>VERIFICATION</u>**

I, Lawrence Gleason, President and Chief Manager of the Debtor, declare under penalty of perjury that the facts set forth in the preceding Motion are true and correct to the best of my knowledge, information and belief.

Dated: _5/4/2022_                 _Lawrence Gleason_
                                             Lawrence Gleason

DocuSign Envelope ID: ██████████████████

**American Express Merchant Financing**

**Business Loan and Security Agreement**                                          Cover Page

 This is a **Business Loan and Security Agreement** ("**Agreement**") between **American Express National Bank** ("**Lender**") and the borrower(s) listed in **Item 3** below (and **Schedule 6**, as applicable) (each, and collectively, "**Borrower**"). This **Agreement** sets out the terms and conditions under which Borrower will receive and repay a commercial loan from Lender and consists of this **Cover Page**, the attached **Terms and Conditions**, the **Signature Page** and all **Schedules** selected below.

| 1. TERM | | ☐ SIX MONTHS | ☑ ONE YEAR | ☐ TWO YEAR |
|---|---|---|---|---|

| 2. AGREEMENT/FINANCE ID: | ████ 4137 █████ |
|---|---|

**3. BORROWER INFORMATION (FOR MULTIPLE BORROWERS, PLEASE ADD SCHEDULE 6)**

| BUSINESS LEGAL NAME: | GLEASON'S GYMNASTIC SCHOOL, INC. | | |
|---|---|---|---|
| D/B/A: | GLEASON'S GYMNASTIC SCHOOL | | |
| TYPE OF ENTITY (CHECK ONE): | ☐ SOLE PROP | ☑ OTHER | |
| PHYSICAL ADDRESS (CITY, STATE, ZIP): | 2015 SILVER BELL RD STE 180, EAGAN, MN , 55122 | | |
| MAILING ADDRESS (IF DIFFERENT): | 2015 SILVER BELL RD STE 180, EAGAN, MN, 55122 | | |
| DATE BUSINESS STARTED(MM/YY): | 09/66 | MERCHANT #: | ████ 4137 |
| FEDERAL ID OR SS#: | ██████ | BUSINESS WEB SITE ADDRESS: | www.gleasons.com |
| CONTACT NAME, TITLE: | LARRY GLEASON, Other Authorizing Officer | CONTACT FAX: | ██████ |
| CONTACT PHONE #: | ██████ | CONTACT EMAIL ADDRESS: | ██████ |

**4. LOAN AND LOAN FEE**

| LOAN: | $250,000.00 | | |
|---|---|---|---|
| LOAN FEE: | [5.5]% OF LOAN | | |

THIS AGREEMENT REQUIRES BORROWER TO PAY LENDER CERTAIN FEES AND CHARGES. THESE FEES AND CHARGES INCLUDE, BUT ARE NOT LIMITED TO, A LOAN FEE EQUAL TO A PERCENTAGE OF THE ORIGINAL PRINCIPAL BALANCE OF THE LOAN, AS WELL AS THOSE OTHER FEES DESCRIBED IN ARTICLE 7.

**5. DISBURSEMENT INFORMATION**

| DISBURSEMENT BANK NAME: | Anchor Bank | | |
|---|---|---|---|
| ABA (BANK ROUTING) NUMBER: | ██████ | DDA (BANK ACCOUNT) NUMBER: | ██████ |

**6. REPAYMENT METHOD (SELECT ONLY ONE BELOW)**

| WITHHOLDING FROM SETTLEMENT AMOUNTS (DAILY) | | |
|---|---|---|
| ☐ AMEX SETTLEMENTS | REPAYMENT RATE: | SEE ALSO SCHEDULE 3 |
| ☐ AMEX AND OTHER NETWORK SETTLEMENTS VIA SPLIT FUNDING | REPAYMENT RATE: | SEE ALSO SCHEDULE 3 |
| ☑ AMEX AND OTHER NETWORK SETTLEMENTS VIA TRANSFER ACCT. | REPAYMENT RATE:    [10]% | SEE ALSO SCHEDULE 3 |
| **DEBIT ACH (DAILY)** | | |
| ☐ DEBIT ACH FROM BUSINESS DEPOSIT ACCOUNT(S) | REPAYMENT AMOUNT: | SEE ALSO SCHEDULE 3 |

| SCHEDULES (APPLICABLE SCHEDULES SELECTED) | |
|---|---|
| ☑ Schedule 1 Definitions | ☑ Schedule 4 Estimated Payment Schedule |
| ☑ Schedule 2 Events of Default | ☑ Schedule 5 Card Processors |
| ☑ Schedule 3 Repayment | ☐ Schedule 6 Multiple Borrower Info and Terms |

**American Express Merchant Financing**
**Business Loan and Security Agreement**                                    **Terms and Conditions**

**Article 1: Parties; Definitions.** Capitalized terms used in this Agreement will have the meanings set forth in Schedule 1.

**Article 2: Effective Date; Term.** The Term begins on the Effective Date, and ends on the Maturity Date. However, if the Outstanding Balance has been paid prior to the Maturity Date, and you have done everything else you are required to do under this Agreement, the Term will end and you will have no further obligations to us under this Agreement (other than those obligations that expressly survive the expiration or termination of this Agreement pursuant to the terms hereof). This Agreement in its entirety, and any obligations on the part of American Express contained herein, are subject to and conditioned upon your promises being true, accurate, and correct in all material respects as of the date of this Agreement and for the duration of this Agreement. You authorize American Express to conduct such due diligence, inquiries, or investigations as we deem necessary to verify the accuracy of your promises, including those concerning your bank account(s) and your and your owner(s)' identity. We will not send you the Loan until we have verified, to our satisfaction, the accuracy of your promises. In the event that we are unable to verify the accuracy of your promises, to our sole and complete satisfaction, we shall notify you that a condition of this Loan Agreement has not been satisfied. If any condition of this Loan Agreement is not satisfied prior to us making any Loan Disbursements under this Loan Agreement, then this Loan Agreement, in its entirety, shall be deemed void, unenforceable, and of no effect, as if there was no agreement. If there is a delay in your receipt of the Loan for these or any other reasons, you agree that there will be no adverse consequence to us.

**Article 3: Loan.** Subject to Article 2 (Effective Date; Term), we agree to advance you the Loan. We will notify you of the Disbursement Date and Maturity Date. You agree that the Maturity Date Notice, when provided to you, will become a part of this Agreement.

**Article 4: Use of Loan Proceeds.** You represent and warrant that you will not use any portion of the Loan to repay any outstanding debt or satisfy any obligation to any of our affiliates, including, without limitation AETRS. REGARDLESS OF ANYTHING ELSE STATED IN THIS AGREEMENT, YOU REPRESENT TO US AND AGREE THAT: (A) YOU WILL USE THE PRINCIPAL AMOUNT OF THE LOAN (AND THE GOODS OR SERVICES YOU BUY WITH THE PRINCIPAL AMOUNT) **SOLELY FOR BUSINESS PURPOSES** AND NOT FOR CONSUMER, PERSONAL, FAMILY OR HOUSEHOLD PURPOSES; (B) YOU WILL NOT USE THE PRINCIPAL AMOUNT OF THE LOAN TO FUND DIVIDENDS OR DISTRIBUTIONS TO YOUR SHAREHOLDERS, PARTNERS, MEMBERS OR OTHER OWNERS OF AN EQUITY INTEREST IN YOUR BUSINESS; AND (C) THIS LOAN IS NOT A "CONSUMER TRANSACTION" (as defined in the UCC).

**Article 5: Promise to Pay.** In exchange for us advancing you the Loan, you unconditionally promise to pay us the principal amount   of the Loan, the Loan Fee and all other amounts this Agreement requires you to pay. You agree to  make payments   to  us in   the  manner stated in   Article 6 (*Repayment*) (and those schedules which are incorporated by reference). As part of your agreement to repay us without conditions, you waive (both as to the original Loan and any renewal, extension, refinancing or consolidation of the Loan): (a) protest, demand and presentment: (b) notice of dishonor, protest or suit; (c) all other notices or requirements necessary to hold you liable hereunder; and (d) all rights of exemption under the constitution or laws of any state as to real or personal property. In the case in which you issue a refund or credit to any of your customers, you agree that we will have no obligation to return to you, from funds which have been repaid to us by you or otherwise, an amount corresponding to any such refund or credit. **YOU AGREE THAT YOUR OBLIGATIONS UNDER THIS AGREEMENT ARE ABSOLUTE AND UNCONDITIONAL, AND WILL CONTINUE IN FULL FORCE AND EFFECT REGARDLESS OF ANY CIRCUMSTANCE WHATSOEVER, AND THAT SUCH OBLIGATIONS WILL NOT BE AFFECTED BY ANY COUNTERCLAIM, SET-OFF, RECOUPMENT, OFFSET, DEFENSE OR OTHER ALLEGED RIGHT AGAINST US.**

**Article 6: Repayment.**

**6.1** Please refer to Schedule 3 for information regarding your repayment mechanics.

**6.2 YOU ACKNOWLEDGE AND AGREE THAT WE ARE MAKING YOU A LOAN AND NOT AN OUTRIGHT PURCHASE OR DISCOUNTING OF RECEIVABLES. YOU MUST PAY US ALL AMOUNTS DUE UNDER THIS AGREEMENT WHETHER OR NOT THE SETTLEMENT AMOUNTS ARE ENOUGH TO PAY THOSE AMOUNTS.**

**6.3** Application of Payments. We will apply the Loan

DocuSign Envelope ID:

**American Express Merchant Financing**

**Business Loan and Security Agreement**                                                                    **Terms and Conditions**

Remittances and amounts debited from your bank accounts to the amounts you owe us. We generally will apply payments first to amounts you owe us other than the principal balance of the Loan and fees (such as for amounts we incur in performing your obligations pursuant to Article 14 (*Right to Perform, Further Assurances*)), then to the principal balance of the Loan and to the Loan Fee and any other fees you owe to us. However, we reserve the right to apply payments in any order or manner we choose, in our sole discretion.

**6.4** Excess Payments. If we receive an Excess Payment, we agree to pay such Excess Payment to you within thirty (30) days after we discover the overpayment. You acknowledge and agree that we have no obligation to return to you or attempt to recover from any third party any funds that we have not received which would become an Excess Payment upon our receipt of such funds.

**6.5** Prepayment. At any time, you may prepay, in full or in part, your obligations under this Agreement. You may prepay such obligation in full by paying us an amount equal to the Outstanding Balance. Prepayments will reduce the Term but the Repayment Rate or Repayment Amount, as applicable, will not be impacted by any prepayment.

**6.6** Additional Payments. You may make payments to us in addition to scheduled Loan Remittances or amounts debited from your deposit accounts to satisfy your obligations under this Agreement. All such payments must be made in immediately available funds and in U.S. Dollars paid via a payment method of which we will notify you. Any payments sent by mail or overnight courier must be addressed to Lender at such address as we may provide to you from time to time. You acknowledge and agree that payments sent to any other address may not be timely processed or credited. Any payments made under this section will not affect in any way your obligation to make Loan Remittances. We may accept late, postdated or partial payments without losing any of our rights under this Agreement or otherwise. We have no obligation to hold postdated checks and may process any postdated check on the date we receive it without being liable to you for any damages or other claims you may assert, which you hereby expressly waive. You agree not to mark any partial payment "paid in full," "without recourse," "in full satisfaction" or with any similar language, and you agree that any such notations will have no

force or effect and that we will not lose any of our rights under this Agreement if we accept any such payments.

**6.7** Maturity Date. Upon the Maturity Date, the Outstanding Balance will be immediately due and payable in full. Until the Outstanding Balance is paid in full, we will have the right to (a) increase the Repayment Rate to 100% and (b) increase the Repayment Amount to an amount equal to the Outstanding Balance or less (in our sole discretion), and debit via Debit ACH Entry this Repayment Amount from the Repayment Account(s) or other bank accounts associated with your business. Your obligations under this Agreement will continue in full force and effect until the Outstanding Balance is paid in full.

**6.8** Designated Account. The Designated Account is the account into which we will fund the Loan and, if this is an Amex Only Loan, into which you receive Settlement Amounts. You represent, warrant and agree that, as of the Effective Date **such account was established for business purposes and continues to be used for business purposes in each case, by the Borrower.** If we or any of our affiliates transfer to the Designated Account, or to any other account held by you, or by any of your Principals, any funds that should have been applied to the amounts due to us under this Agreement, or if you otherwise have monies deposited into your or any Principal's accounts that otherwise should have been applied to amounts due to us under this Agreement, you immediately will pay or cause the Principal to pay to us all such funds.

**6.9** Contact with Card Processors. (a) You hereby (i) authorize us to contact your Card Processors and any of your past, present or future processors to obtain any information that we deem necessary or appropriate regarding any of your transactions with such processors, (ii) authorize us to instruct your Card Processors to adjust the Repayment Rate in accordance with this Agreement, and (iii) authorize and direct such Card Processors to provide us with all such information at Borrowers' expense and make any requested changes to the Repayment Rate.

**6.10** Loan Account. We will maintain, in accordance with our customary procedures, a loan account in your name in which we will record the date and amount of the Loan and the date and amount of each payment in respect of the Loan and the date and amount of each payment and each payment which is returned for insufficient funds or returned for any other

American Express Merchant Financing
**Business Loan and Security Agreement**                                        **Terms and Conditions**

reason in respect of the Loan; *provided, however*, that our failure to record the date and amount of the Loan will not adversely affect us. Each month, we will make available to you a statement showing the accounting for the Loan made, and the payments made or credited in respect thereof. The monthly statements will be deemed correct and binding upon you in the absence of manifest error and will constitute an account stated between us and you unless we receive a signed statement of your specific exceptions thereto within thirty (30) days after such statement is received by you. Our records with respect to the loan account will be conclusive evidence absent manifest error of the amount of the Loan and other charges thereto and of payments applicable thereto.

**Article 7: Fees; Rebate.**

**7.1** Upon the Disbursement Date, subject to Article 15 (*Usury Savings Clause*), we will have fully earned the Loan Fee. The Loan Fee will be payable upon the earliest to occur of (a) the date upon which the Loan is repaid in full, (b) the Maturity Date or (c) the date the amounts due under this Agreement are accelerated pursuant to Article 9 (*Defaults; Remedies*).

**7.2** Late and Other Fees. We will assess from time to time whether any of the Outstanding Balance is past due. In the event you are past due, we may assess and you agree to pay a late fee of the greater of (a) 2.99% of the amount past due in any given month and (b) $39. Late fees will not accrue past the month in which they were incurred. In addition, you agree to reimburse us for all fees, costs and expenses incurred by us in connection with any rejected ACH transaction or returned check. We have the right, but not the obligation, to charge you a fee of $20 for each rejected ACH transaction or returned check. The total amount of these fees in any month, will be listed in the following month's statement and will be debited from your account on the first day of the month following the month in which the charges were incurred. You and each Signing Principal hereby irrevocably authorize us (such authorization being coupled with an interest) to debit or otherwise withdraw (via the ACH system, electronic checks, wires or otherwise) from any deposit accounts owned or controlled by you, including without limitation, the Repayment Account(s), any fees we are entitled to receive under this Agreement.

**7.3** Collection Costs and Fees. To the extent not prohibited

by applicable law, you will pay to us any and all expenses, including collection costs, attorneys' fees and expenses, expert fees and expenses, and all other expenses which may be incurred by us in the prosecution, defense, settlement and/or other resolution of any claim, demand, action or proceeding arising out of or relating to this Agreement, the Collateral or any of our related rights or interests, regardless of whether you are a party to that action or proceeding or made aware of the claim or demand before it is resolved. Without limiting the generality of the foregoing, the expenses you will pay to us include counsel fees and expenses incurred in any bankruptcy or insolvency proceedings and all costs and expenses (including search fees) incurred or paid by us for the purpose of administering, protecting or realizing our security under this Agreement. All amounts described in this section will be considered advances to protect our security, and will be secured by this Agreement.

**7.4** Rebate. Provided no Event of Default has occurred during the Term: (a) if you have a Six Month Loan: (i) If the Outstanding Balance has been repaid in full within 90 days of the Disbursement Date, you will receive a rebate equal to 25% of the Loan Fee; or (ii) If the Outstanding Balance has been repaid in full within 135 days of the Disbursement Date, you will receive a rebate equal to 10% of the Loan Fee; or (b) if you have a One Year Loan: (i) If the Outstanding Balance has been repaid in full within 180 days of the Disbursement Date, you will receive a rebate equal to 25% of the Loan Fee; or (ii) If the Outstanding Balance has been repaid in full within 270 days of the Disbursement Date, you will receive a rebate equal to 10% of the Loan Fee; or (c) if you have a Two Year Loan: (i) If the Outstanding Balance has been repaid in full within 360 days of the Disbursement Date, you will receive a rebate equal to 25% of the Loan Fee; or (ii) If the Outstanding Balance has been repaid in full within 540 days of the Disbursement Date, you will receive a rebate equal to 10% of the Loan Fee.

**Article 8: Implicit Interest Rate.** It is possible to calculate an implicit interest rate based upon the principal amount of the Loan advanced, the rate and amount of payments received with respect to the Loan and the Loan Fee or other fees paid. However, this Agreement does not have an interest rate and you agree that, other than as provided in Section 7.4 or Article 15 (*Usury Savings Clause*), we have no obligation to adjust either the Repayment Rate, Repayment Amount or the amount of the Loan Fee if your volume of Loan Remittances is greater or less than what either of us anticipated at the time

**American Express Merchant Financing**
**Business Loan and Security Agreement**                                    **Terms and Conditions**

we made this Agreement. You also acknowledge and agree that, if your volume of Loan Remittances is greater than what either of us anticipated at the time we made this Agreement or you incur fees, the effective interest rate under this Agreement may be higher than the implicit interest rate.

## Article 9: Defaults; Remedies.

**9.1** Events of Default are set out in <u>Schedule 2</u>.

**9.2** Upon the occurrence of an Event of Default under <u>Schedule 2, Business Entity/Guarantor #2</u> (excluding sub-clause (v) thereof), the Outstanding Balance will be immediately due and payable. Upon the occurrence of any other Event of Default, we will have the right, but not the obligation, to declare the Outstanding Balance to be immediately due and payable, and increase the Repayment Rate and/or the Repayment Amount, as applicable. In addition, we will have and may exercise any and all other rights and remedies available to us as a secured party at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of our rights and remedies, whether evidenced by this Agreement or by any other record, will be cumulative and may be exercised singularly or concurrently. Election by us to pursue any remedy will not constitute a waiver of our rights to pursue other remedies. No forbearance or delay by us will be deemed to waive any of our rights or remedies or create a course of dealing between the parties. Any election by us to make expenditures or to take action to perform one or more of your obligations under this Agreement, after your failure to perform, will not affect our right to declare an Event of Default and exercise our remedies.

**9.3** <u>Authorization to Withdraw from Deposit Accounts for Past Due Amounts and/or upon Event of Default</u>. You hereby irrevocably authorize us (such authorization being coupled with an interest) to debit or otherwise withdraw (via the ACH system, electronic checks, wires or otherwise) any funds we are entitled to receive under this Agreement for past due amounts and/or upon the occurrence of an Event of Default from any deposit accounts owned or controlled by you, including without limitation, the Designated Account, the Transfer Account and the Repayment Account(s), as applicable. You represent, warrant and agree that, as of the date of and during the Term of this Agreement, each such

deposit account was established for business purposes and continues to be used for business purposes. If you have a Debit ACH Loan, the specific allocations of the amounts to be debited from each of the specific Repayment Account(s) set out in <u>Schedule 3, if any</u>, will no longer apply. This authorization may not be revoked until we have received the amounts past due, or, upon an Event of Default, the Outstanding Balance. You acknowledge and agree that we may issue pre-notifications to your bank(s) with respect to such debits, withdrawals and other transactions. Further, you agree that you will provide such information and execute such documents to enable us to make such debits as may be reasonably requested by the financial institution(s) at which such deposit accounts are held. Within two (2) business days of any request by us, you will provide, or cause the applicable financial institutions to provide, us with records and/or other information regarding the Designated Account and any other deposit accounts owned or controlled by you. You hereby authorize and direct the applicable financial institutions to provide us with all such information at your expense.

**9.4** <u>Payment through Settlement Amounts</u>.
(i) If you have a Withholding Loan: In any month that the Minimum Payment for a given date is not met, the difference between the Minimum Payment and the actual Loan Remittances received as of such date will be deemed to be past due. If at any time any portion of the Outstanding Balance becomes past due, Lender may increase the Repayment Rate up to 100% until (a) no portion of the Outstanding Balance is past due or (b) pursuant to <u>Schedule 2</u>, for so long as necessary, at Lender's sole but reasonable discretion, to ensure the Borrower meets each Minimum Payment contained in the Payment Schedule.
(ii) If you have a Debit ACH Loan and if you are party to a Card Acceptance Agreement with our affiliate, AETRS, governing your acceptance of Amex Cards, then upon the occurrence of an Event of Default and/or when any amount is past due, you authorize us to contact AETRS and, notwithstanding anything to the contrary in the Card Acceptance Agreement, instruct AETRS to remit the amount equal to the Repayment Rate (which will be determined by us in our sole discretion and will be a percentage not to exceed one hundred percent (100%) of the Amex Settlement Amounts) of the Amex Settlement Amounts to us, rather than to disburse such amounts to you until such time as we have received the amounts past due, or, upon an Event of Default, the Outstanding Balance; such authorization, instruction and direction being coupled with an

DocuSign Envelope ID: ███████████████

**American Express Merchant Financing**

**Business Loan and Security Agreement**                                   Terms and Conditions

interest and irrevocable until all of your obligations hereunder have been indefeasibly and fully paid and performed. You may not revoke this authorization and instruction without our prior written consent. You waive any claim for damages you may have against us, AETRS, or our affiliates in connection with actions taken based on such instructions. You acknowledge and agree that all amounts we receive attributable to Amex Settlement Amounts will arise from bona fide sales by you of your goods and services to customers who present their Amex Cards as payment.

**9.5** Account Debtors. In addition to any other remedies available hereunder, upon the occurrence of an Event of Default, we will have the right,without waiving any of our rights or remedies and without notice to you or any other party, to notify any of your account debtors (as defined in the UCC) to make payment to us of all or any portion of the amounts received or held by such account debtor for or on your behalf to pay any amounts we are entitled to receive hereunder. You hereby grant to us an irrevocable power of attorney, which power of attorney will be coupled with an interest, and hereby appoint us and our designees as your attorney-in-fact, to take any and all actions necessary or appropriate to direct any account debtor to make payment to us as contemplated by this Agreement. For the avoidance of doubt,"account debtor" will include Card Processors.

**9.6** Setoff. In addition to any rights and remedies of Lender provided by law, upon the occurrence and during the continuance of any Event of Default, Lender and any affiliate of Lender is authorized at any time and from time to time, but without prior notice to Borrower (any such notice being waived by Borrower), to the fullest extent permitted by law, to recoup from, setoff against and apply any and all deposits or other collateral at any time held by, funds in the possession of, and other indebtedness or obligations at any time owing by, Lender or such affiliate to or for the credit or the account of Borrower against any and all obligations owing to Lender hereunder, now or hereafter existing, irrespective of whether or not Lender will have made demand under this Agreement and although such obligations may be contingent or unmatured or denominated in a currency different from that of the applicable deposit, funds or indebtedness.

**Article 10: Representations, Warranties and Covenants.** You and each Signing Principal represents, warrants and

covenants the following as of the Effective Date and during the Term of this Agreement:

**10.1** Name, Location, Authority, Etc. (a) You are and will remain duly organized, licensed, validly existing and in good standing under the laws of your state of formation and are and will remain duly qualified, licensed and in good standing in each and every other state in which the failure to do so could have a material adverse effect on your financial condition, business or operations; (b) your exact legal name set forth in Item # 3 of the Cover Page is true and correct and you do not and will not conduct your business under any other name (other than the D/B/A listed in Item # 3 of the Cover Page); (c) you will not change your place of business, your legal name, entity type or state of formation; (d) you are authorized and permitted, by law, your organizational documents, any contracts to which you or any Signing Principal is a party and otherwise, to execute, deliver and perform this Agreement and all related documents; (e) you are subject to no charter, corporate or other legal restriction, or any judgment, award, decree, order, governmental rule or regulation or contractual restriction that could have a material adverse effect on your financial condition, business or prospects; and (f) you are and will continue to be in compliance with your organizational and formation documents, all contractual requirements by which you may be bound, and all applicable federal, state and local laws, statutes, regulations, ordinances and rules pertaining to the conduct of your business, including without limitation (i) if you accept Cards, the regulations of card associations and payment networks, and (ii) maintaining any licenses, approvals, consents, registrations and other authorizations necessary for the conduct of your business; (g) all information (financial and other) provided by or on your or any Signing Principal's behalf to us in connection with or pursuant to this Agreement is true, accurate and complete in all respects.

**10.2** Your Business and Operations. You (a) will not sell or otherwise transfer your business without: (i) our express prior signed consent and (ii) the assumption of all of your obligations under this Agreement using documentation reasonably satisfactory to us; and (b) are current on the lease or mortgage, as applicable, for each of your business locations. Other than as disclosed to us in a signed record delivered to us, no eviction or foreclosure is pending or threatened against you.

DocuSign Envelope ID:

**American Express Merchant Financing**

**Business Loan and Security Agreement**

**10.3** Financial Indebtedness. Except for the indebtedness disclosed to us in a signed record delivered to us prior to the Effective Date, and other than those charges made on any of your Cards in the normal course of business, you will not incur any additional financial indebtedness without our prior signed consent and you do not have another Merchant Financing loan outstanding.

**10.4** Card Processing Arrangements. You will: (a) except as expressly permitted by applicable law, not do or fail to do anything that could have an adverse effect on the acceptance or authorization of Cards for the purchase of your goods and services, including, for example, failing to promptly repair any inoperable Card processing equipment; (b) comply with the agreements governing your acceptance of Cards, at all times (including, as applicable, the Card Acceptance Agreement); (c) not change your Card Processor during the Term without our prior signed consent and, if AETRS is your Card Processor, not change your payment option from net pay under your Card Acceptance Agreement without our consent; (d) if you have a Withholding Loan (i) at all times ensure that all Loan Remittances are sent directly to us (or the Transfer Account, as applicable); (ii) not open a new account other than the Repayment Account(s) and/or Transfer Account to which Settlement Amounts will be deposited; (iii) not take any action to cause Settlement Amounts to be settled or delivered to any person or account other than us or the Transfer Account, as applicable; (e) not revoke or cancel any of the authorizations to debit or otherwise withdraw from or access the Designated Account, Transfer Account or any other account described in this Agreement; (f) not change the Designated Account without our prior signed consent; (g) not add, remove or otherwise alter the payees associated with your business without our prior signed consent. Schedule 5 lists any and all of your Card Processors and any and all of your arrangements for payment the proceeds of all credit and debit card charges for your sales, including, with respect to each such Card Processor, (a) the name of that Card Processor and (b) the merchant identification number assigned to any Borrower by such Card Processor. You agree during the Term of this Agreement that you will promptly (and in any event within five (5) business days thereof) provide notice to Lender of any change to Schedule 5 attached hereto, together with an updated Schedule 5 incorporating such change(s).

**10.5** Insurance. You will maintain insurance in such amounts

and against such risks as are consistent with past practice and will show proof of such insurance upon our request.

**10.6** Business Information; Reliance. You and each Signing Principal will furnish us such information as we may request from time to time within 14 days of the date of such request, including, without limitation, tax records, financial statements (including, the most recent consolidated balance sheets and consolidated statements of earnings), bank statements and a duly completed and executed Form-4506T (or its equivalent). You acknowledge and agree that all information (financial and other) provided by or on behalf of you and/or any Signing Principal has been relied upon by us in connection with our decision to advance you the Loan. Failure to provide requested information is an Event of Default, and may be a factor in future decisions to extend credit to you.

**10.7** Restrictions. (a) there is no action, suit, proceeding or investigation pending or, to your knowledge, threatened against or affecting you or any of your assets before or by any court or other governmental authority which, if determined adversely to you, would have a material adverse effect on your financial condition, business or prospects or the value of the Collateral; (b) neither you nor any of your direct or indirect owners of at least 25% are (i) listed on the U.S. Department of Treasury, Office of Foreign Assets Control, Specially Designated Nationals and Blocked Persons List (available at www.treas.gov/ofac), (ii) listed on the U.S. Department of State's Terrorism Exclusion List (available at www.state.gov), or (iii) located in or operating under license issued by a jurisdiction identified by the U.S. Department of State as a sponsor of international terrorism, by the U.S. Secretary of the Treasury as warranting special measures due to money laundering concerns, or as non-cooperative with international anti-money laundering principles or procedures by an intergovernmental group or organization of which the United States is a member.

**10.8** Transactions Involving Settlement Amounts. You will not (a) enter into any arrangement, agreement or commitment that relates to or involves the pledge or sale of Settlement Amounts, whether in the form of a purchase of, a loan against, or the sale or purchase of credits against, Settlement Amounts with any person or entity other than us; or (b) allow any Lien to exist on any Settlement Amounts.

**10.9** Inspection of Collateral and Place of Business. We, or

DocuSign Envelope ID: ███████████████████
**American Express Merchant Financing**
**Business Loan and Security Agreement**                                                            **Terms and Conditions**

such other third party as we may designate, will have the right during your normal business hours and at any other reasonable time to examine the Collateral where located and the interior and exterior of any of your places of business. We may examine, among other things, whether you (a) have a place of business that is separate from any personal residence, (b) are open for business, (c) have sufficient inventory to conduct your business and (d) have one or more point-of-sale terminals to process Card transactions. When performing an examination, we may photograph the interior and exterior of any your places of business, including any signage, and may photograph any Principal.

**10.10** Solvency. You represent and warrant that you do not presently intend to close or cease operating your business, in whole or in part, temporarily or permanently. As of the date of this Agreement, you are solvent and are not contemplating any insolvency or bankruptcy proceeding. During the four (4) months preceding the date of this Agreement, neither you nor any Principal has discussed with or among your management, with counsel, or with any other advisor or creditor, any potential insolvency, bankruptcy, receivership, or assignment for the benefit of your creditors and no such action or proceeding has been filed or is pending.

**10.11** Confidentiality; Press Releases. You and each Signing Principal understand and agree that the terms and conditions of the products and services we offer, including this Agreement and any other documentation provided by us, is our proprietary and confidential information. Accordingly, unless disclosure is required by applicable law or court order, you will not disclose such information to any person other than your attorneys, accountants, financial advisors or employees who need to know such information for the purpose of advising you, provided that such advisors use such information solely to advise you and first agree in a signed record to keep such information confidential. You will not issue any press release or make any public announcement (or both) in respect of this Agreement or us without our prior signed consent. In the event that you were referred to us by a third party, you acknowledge and agree that we may inform such third party that we extended you a Loan under this Agreement.

**10.12** Credit Reports and Information Sharing. You and Signing Principal authorize us to verify your information and

obtain reports from commercial and consumer reporting agencies or other third parties, including from our affiliates, from time to time as permitted by applicable law. You agree that we may investigate your ability to pay and obtain information about you from other sources, including information to verify your income. You authorize us and our affiliates and subsidiaries to share information we have about you at any time for marketing and administrative purposes as permitted by law. And you agree that we will use such information for any purposes, subject to applicable law. Upon request, we will tell you if we have received a consumer report and the name and address of the agency that provided it.

You agree that we will give information about your Loan to credit reporting agencies. For example, we will tell a credit reporting agency if you fail to make a payment or fail to comply with any other term of this Loan Agreement, or otherwise default on your Loan. This may have a negative impact on your credit reports.

If you believe information we have given to a credit reporting agency is incorrect, write to us at: American Express Credit Bureau Unit, P.O. Box 981537, El Paso, TX 79998-1537. When you write to us, tell us the specific information you believe is incorrect.

You waive to the maximum extent permitted by law any claim for damages against us or any of our affiliates relating to any (a) investigation undertaken by or on your behalf as permitted by this Loan Agreement or (b) disclosure of information as permitted by this Loan Agreement. You also agree that we may release information if we believe it is required to comply with any governmental or legal process, whether or not such release is actually required, or when it is necessary or desirable in connection with a transaction or investigating a loss or potential loss.

**Article 11:** **Indemnification; Limitation of Liability.** You will indemnify and hold the Indemnified Parties harmless from and against all losses, damages, claims, liabilities, obligations, penalties, suits, actions, controversies, or proceedings of any kind, imposed upon, incurred by, or asserted against any of the Indemnified Parties, in any way arising from, in connection with, relating to, or incident to your breach of this Agreement, including the payment of all costs and expenses of every kind for the enforcement of our rights and remedies hereunder. Such amounts will bear interest at the rate for prejudgment interest prevailing in your jurisdiction until paid. IN NO EVENT WILL WE BE LIABLE FOR ANY CLAIMS ASSERTED BY YOU

Case 22-30690    Doc 8    Filed 05/04/22    Entered 05/04/22 12:06:24    Desc Main
Document    Page 17 of 68
DocuSign Envelope ID: ██████████████████

**American Express Merchant Financing**

**Business Loan and Security Agreement**                                          **Terms and Conditions**

UNDER ANY THEORY OF LAW, INCLUDING ANY TORT OR CONTRACT THEORY FOR LOST PROFITS, LOST REVENUES, LOST BUSINESS OPPORTUNITIES, EXEMPLARY, PUNITIVE, SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES, EACH OF WHICH YOU HEREBY EXPRESSLY WAIVE. The foregoing indemnities are continuing indemnities and will survive expiration or termination of this Agreement for any reason.

**Article 12: Grant of Security Interest.** Capitalized terms used in this section without definition which are not defined elsewhere in this Agreement have the meanings provided in the UCC. For valuable consideration and to secure the prompt payment and performance in full of all of your indebtedness, liabilities and obligations to us, whether direct or indirect, joint or several, absolute or contingent, due or to become due, now existing or hereafter arising, whether or not such indebtedness, liabilities and obligations relate to the Loan described in this Agreement and whether or not contemplated by the parties at the time of the granting of this security interest, regardless of how they arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument and including obligations to perform acts and refrain from taking action as well as obligations to pay money, including all interest, other fees and expenses, you hereby grant to us a security interest in the following properties, assets and rights (the "Collateral"), wherever located, whether now owned or hereafter acquired or arising and howsoever your interest therein may arise or appear (whether by ownership, lease, security interest, claim, or otherwise): (a) any and all amounts owing to you now or in the future from any merchant processor, including the Settlement Amounts; (b) all Accounts; (c) all Chattel Paper (including Tangible Chattel Paper and Electronic Chattel Paper); (d) all Instruments; (e) all Goods, including, without limitation, Equipment, Inventory, Farm Products, Accessions, and As Extracted Collateral; (f) all Documents; (g) all General Intangibles (including, without limitation, Payment Intangibles and software); (h) all Deposit Accounts; (i) all Letter of Credit Rights; (j) all Investment Property; (k) all Supporting Obligations; (l) all trademarks, trade names, service marks, logos and other sources of business identifiers, and all registrations, recordings and applications with the U.S. Patent and Trademark Office and all renewals, reissues and extensions thereof; (m) any records and data relating to any of the foregoing, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of your right, title and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media; and (n) any and all proceeds of any of the foregoing, including insurance proceeds or other proceeds from the sale, destruction, loss, or other disposition of any of any of the foregoing, and sums due from a third party who has damaged or destroyed any of the foregoing or from that party's insurer, whether due to judgment, settlement or other process. Notwithstanding the foregoing, the Collateral does not include any real estate, motor vehicles, household furniture or fixtures, and any other goods for personal, family or household use. You irrevocably authorize us at any time and from time to time to file: (i) in any filing office in any jurisdiction any initial financing statements and amendments thereto that indicate the collateral therein as all of your assets or words of similar effect, regardless of whether such description is greater in scope than the collateral pledged to us hereunder; and (ii) such recordations with the U.S. Patent and Trademark Office we deem necessary or desirable to evidence the security interest in intellectual property described above.

**Article 13: Assignment.** Without our prior signed consent, you will not pledge, cancel, revoke or assign this Agreement or your rights hereunder. Any prohibited assignment will be void. No consent to an assignment by us will release you from your obligations hereunder. We may assign, mortgage, pledge or otherwise transfer or delegate this Agreement or any of our rights or obligations hereunder without notifying you or obtaining your consent. Without limiting the generality of the foregoing, we may grant a security interest in any and all of our rights and interests pursuant to this Agreement, including our rights and interests in and to the Repayment Rate, the principal amount of the Loan and the Loan Fee, to an Assignee, including parties from whom we may obtain financing, and you agree that such Assignee is entitled to enforce any and all of our rights, remedies and interests under this Agreement. Any Assignee will have all of our rights, but no liability for any of our obligations under this Agreement, and you agree that you will not assert against any Assignee any defense, counterclaim, set-off, recoupment, offset or other alleged right that you may have against us. Upon and following receipt of signed notification by an Assignee to you, you are authorized and directed to remit any and all amounts then or thereafter payable by you to us directly to such

**American Express Merchant Financing**

Business Loan and Security Agreement

Assignee. As between you and any such Assignee, any remittance sent to us following such receipt will not constitute payment unless and until such payment is actually received by such Assignee.

**Article 14: Right to Perform; Further Assurances.** You agree to promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that we may reasonably request, in order to (a) create and/or maintain the validity, perfection or priority of and protect any security interest granted hereby, (b) enable us to exercise and enforce our rights and remedies hereunder with respect to any Collateral, and (c) evidence or effect your agreements and obligations under this Agreement. YOU ACKNOWLEDGE THAT THE FEES WE CHARGE TO YOU FOR DOCUMENTATION, ORIGINATION, TAX COMPLIANCE OR ANY OTHER MATTER ASSOCIATED WITH THIS AGREEMENT MAY REPRESENT PROFIT TO US IN WHOLE OR IN PART AND MAY NOT BE MERELY A REIMBURSEMENT FOR ACTUAL COSTS.

**Article 15: Usury Savings Clause.** It is the intention of parties hereto to comply strictly with applicable laws and accordingly, in no event and upon no contingency will we ever be entitled to receive, collect, or apply payments as interest in excess of the Maximum Rate.In the event that we ever receive, collect, or apply payments as interest in excess of the Maximum Rate, such amount which, but for this provision, would be excessive interest, will be applied to the reduction of the principal balance owed hereunder; and if said principal balance, and all lawful interest thereon, is paid in full, any remaining excess will forthwith be paid to you, or another party lawfully entitled thereto. In addition, in the event that we determine that as a result of your volume of Loan Remittances being greater than what either of us anticipated at the time we made this Agreement, our charging the full amount of the Loan Fee would exceed the Maximum Rate, we will give you a rebate so that the Loan Fee does not exceed the Maximum Rate. In determining whether or not the interest or fees paid or payable, under any specific contingency, exceeds the highest rate which we may lawfully charge under applicable law from time to time in effect, the parties will, to the maximum extent permitted under applicable law, characterize any non-principal payment as a reasonable loan charge, rather than as interest. Any provision hereof, or of any other agreement between the parties, that operates to bind, obligate, or

compel you to pay interest in excess of such Maximum Rate will be construed to require the payment of the Maximum Rate only. The provisions of this article will be given precedence over any other provision contained herein or in any other agreement between the parties that is in conflict with the provisions of this section.

**Article 16: Notices; Calls; Call Monitoring.**

**16.1 Notices.** Except as otherwise provided in this Agreement, all communications concerning this Agreement will be personally delivered or sent by U.S. postal service, first class mail, postage prepaid or by expedited mail courier service. In addition, Lender may, in its sole discretion, send such communications to Borrower electronically in the manner described in this article. Communications sent by personal delivery, U.S. mail or expedited mail courier will be sent to Borrower at the mailing address set out in Item #3 of the Cover Page, and any such notice to us will be at the following address (or to any other address as may be specified by either party by a notice given as provided herein):

American Express National Bank
c/o: Datamark Inc.
Attn: Merchant Financing Counsel
43 Butterfield Circle
El Paso, TX 79906

Communications may be sent electronically by Lender to Borrower (a) by transmitting the communication to the electronic address provided by the Borrower or to such other electronic address as Borrower may specify from time to time in writing, or (b) by posting the communication on a website and sending the Borrower a notice to Borrower's postal address or electronic address telling Borrower that the communication has been posted, its location, and providing instructions on how to view it. Communications will be effective (i) if mailed, upon the earlier of receipt or five (5) days after deposit in the U.S. mail, first class, postage prepaid, or (ii) if hand-delivered, by courier or otherwise (including telegram, lettergram or mailgram), when delivered. Communications sent electronically to Borrower will be effective when the communication, or a notice advising of its posting to a website, is sent to Borrower's electronic address.

**16.2 Servicing and Collections Calls/Texts.** If we need to contact you to service your Loan or to collect amounts you owe, you authorize us (and our affiliates, agents and contractors) to contact you at any number you provide, from

**American Express Merchant Financing**

| Business Loan and Security Agreement | Terms and Conditions |
|---|---|

which you call us, or at which we believe we can reach you. We may contact you in any way, such as calling or texting. We may contact you using an automated dialer or prerecorded messages. You may contact you on a mobile, wireless or similar device, even if you are charged for it.

**16.3 Call Monitoring.** We may monitor and record any calls and/or web sessions between you and us.

**Article 17: JURY TRIAL AND CLASS ACTION WAIVERS.** EACH PARTY HERETO: (a) HEREBY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY SUIT, ACTION CONTROVERSY OR PROCEEDING OF ANY KIND ON ANY MATTER ARISING OUT OF, RELATING TO, IN CONNECTION WITH, OR INCIDENT TO THIS AGREEMENT OR ANY TRANSACTIONS IT CONTEMPLATES OR THE ENFORCEMENT HEREOF, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY; AND (b) HEREBY WAIVES ANY RIGHT TO ASSERT ANY CLAIMS AGAINST ANY OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AGAINST PUBLIC POLICY. TO THE EXTENT ANY PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST ANY OTHER PARTY, THE PARTIES HEREBY AGREE THAT: (i) THE PREVAILING PARTY WILL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOTWITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (ii) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THESE WAIVERS KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THESE WAIVERS WITH THEIR ATTORNEYS.

**Article 18: GOVERNING LAW; JURISDICTION; SERVICE OF PROCESS.** THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO ALL ISSUES CONCERNING THE VALIDITY OF THE AGREEMENT AND THE LOAN TRANSACTION THAT IT CONTEMPLATES, THE CONSTRUCTION OF ITS TERMS, AND THE INTERPRETATION, PERFORMANCE AND ENFORCEMENT OF THE RIGHTS AND DUTIES OF EACH OF THE PARTIES, WILL

BE GOVERNED BY AND ENFORCED IN ACCORDANCE WITH FEDERAL LAW AND THE LAWS OF THE STATE OF UTAH, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS THAT WOULD REQUIRE THE APPLICATION OF ANY OTHER LAW. THE PARTIES ACKNOWLEDGE AND AGREE THAT THIS AGREEMENT IS MADE AND PERFORMED IN THE STATE OF UTAH. You and Principal(s) further irrevocably and unconditionally consent and submit to the jurisdiction of any state or federal court located in the State of Utah, the State of New York and the State of the principal place of business of the Borrower to resolve any suit, action, controversy, or proceeding of any kind between or among the Parties, arising out of or related to this Agreement. You and Principal(s) hereby agree that any of the above-named courts will be a convenient forum for any such suit, action, controversy, or proceeding of any kind between or among the Parties, arising out of or related to this Agreement. You and Principal(s) waive, to the fullest extent permitted by law, (a) any objection that you or Principal(s) may now or later have to the laying of venue of any suit, action, controversy, or proceeding arising out of, relating to, in connection with, or incident to this Agreement or any of the transactions it contemplates in any of the above-named courts, (b) any objection to personal jurisdiction applying in any such court, and (c) any claim that any such suit, action, controversy or proceeding brought in any such court has been brought in an inconvenient forum. You and Principal(s) agree that service of process in any such suit, action, controversy, or proceeding may be served on any of them by mailing or delivering a copy of the process to any of the addresses set forth in this Agreement or any other address you or Principal(s) has provided to us. Nothing set forth in this section affects the right to serve process in any other manner permitted by law. You and Principal(s) understand and agree that: (i) we are located in the State of Utah; (ii) we make all credit decisions from our office in Utah; (iii) the loan hereunder is made in Utah (that is, no binding contract will be formed until we receive and accept your signed Agreement in Utah); and (iv) your payments are not accepted until we receive them in Utah.

**Article 19: Counterparts.** This Agreement (or any agreement or document required by this Agreement, or any amendment to this Agreement) may be executed in as many counterparts as necessary or convenient, including both counterparts that are executed on paper and counterparts that are electronic records and executed electronically, and each executed counterpart will be deemed an original. All such counterparts

**American Express Merchant Financing**

Business Loan and Security Agreement | Terms and Conditions

will constitute one and the same agreement. Delivery of a manually executed paper counterpart of this Agreement (or of any agreement or document required by this Agreement, or any amendment to this Agreement) by telecopy or other electronic imaging means will be as effective and enforceable as delivery of such manually executed paper counterpart of this Agreement.

**Article 20: <u>IMPORTANT INFORMATION ABOUT OPENING A NEW ACCOUNT AT AMERICAN EXPRESS NATIONAL BANK.</u>** Federal law requires all financial institutions to obtain, verify, and record information that identifies each person and entity that opens an account or establishes a relationship with us, including name, address, date of birth, social security or tax identification number and other information that will allow us to verify your and/or its identity. We may also ask you to provide identifying documents.

**Article 21. <u>Interpretation; Miscellaneous.</u>** The provisions of this Agreement will be severable and if any provision will be invalid, void or unenforceable in whole or in part for any reason, the remaining provisions will remain in full force and effect. This Agreement will be binding upon and will inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and assigns (subject nevertheless to restrictions provided in Article 13 (*Assignment*)). This Agreement, together with the other agreements and instruments mentioned herein or executed by you contemporaneously herewith, constitutes the entire agreement of the parties and we will not be charged with any agreement or representation not contained in a signed record executed by us as provided herein. All rights and obligations of AETRS, Lender, our affiliates and the Borrower concerning Amex Card acceptance continue to be governed by the terms of the Card Acceptance Agreement to the extent the Borrower is separately a party to such an agreement. Absent manifest error, our records will be conclusive evidence with respect to the matters governed by this Agreement (including the total amount of the Loan Remittances paid to us) but the failure to record any such amount in such records or otherwise will not limit or affect your obligations or our rights hereunder. Whenever terms such as "include" or "including" are used in herein, they will mean "include" or "including," as the case may be, without limiting the generality of any description or word preceding such term. Whenever terms such as "acceptable to us" or "to our satisfaction" are used or we are granted the contractual

right to choose between alternatives or express our opinion, the satisfaction, choices and opinions are to be made in our sole and absolute discretion. The captions or headings herein are made for convenience and general reference only and will not be construed to describe, define or limit the scope or intent of the provisions of such document. As used herein, all masculine pronouns will include the feminine or neuter, and all singular terms the plural forms thereof, and vice versa. Any exhibits annexed hereto are incorporated herein and made a part hereof as if contained in the body of this Agreement. All references to articles or sections will be deemed to refer to articles or sections of this Agreement, unless otherwise expressly provided, whether or not "hereof," "above," "below" or like words are used. This Agreement has been drafted by our counsel as a convenience to the parties only and will not, by reason of such action, be construed against us or any other party. For Agreements for which the Borrower signs in Florida: Florida documentary stamp tax required by law has been paid or will be paid directly to the Florida Department of Revenue. Certificate of Registration No. ███████████

DocuSign Envelope ID: ███████████████████

**American Express Merchant Financing**

**Business Loan and Security Agreement**                                                  **Terms and Conditions**

Borrower:        GLEASON'S GYMNASTIC SCHOOL, INC.

By:

Print Name:      LARRY GLEASON

Title:           Other Authorizing Officer

Date:            March 5, 2019

*For Lender's Use Only: This has been received and accepted by*
*the Lender after being signed by the Borrower.*

By:

Print Name:      Richard J. Fennell, Chief Credit Officer

                 American Express National Bank

Date:            March 5, 2019

**American Express Merchant Financing**

**Business Loan and Security Agreement**                    <u>SCHEDULE 1</u> – **Definitions**

**AETRS** means our affiliate, American Express Travel Related Services Company, Inc.

**Amex Cards** means all forms of American Express bank cards and other American Express payment devices used by you for electronic transactions (whether or not such devices were in use when this Agreement was made), including credit, debit, charge, smart, electronic benefit transfer, contactless and RFID-enabled cards.

**Amex Only** means a Loan which is set up to be repaid through withholding a percentage of Amex Settlement Amounts.

**Amex Settlement Amounts** means, for any applicable period, all proceeds, settlements, payments or other amounts that you receive with respect to all Amex Cards.

**Assignee** means any third party to which Lender grants any or all of its rights and interests under this Agreement.

**Business Day** means Monday through Friday, except for a day on which the Federal Reserve Bank of New York or banking and savings and loan institutions in the State of New York are closed.

**Cards** means (i) if your Loan is Amex Only, Amex Cards and (ii) otherwise, Other Network Cards together with Amex Cards.

**Card Acceptance Agreement** means the agreement, if any, between Borrower and AETRS governing Borrower's acceptance of Amex Cards.

**Card Processor** means a service provider who facilitates debit and credit card authentication and submission processing.

**Collateral** is defined in Article 12.

**Cover Page** means the cover page of this Agreement, as set out in the header of such page.

**Debit ACH Entries** mean the debits which we initiate on your behalf using the ACH Network.

**Debit ACH Loan** means a Loan which is to be repaid through Debit ACH Entries.

**Designated Account** means the account into which we will fund the Loan, and, if you accept Cards, into which you receive Settlement Amounts, as such account is listed in Item #5 of the Cover Page.

**Disbursement Date** means the date we disburse the Loan to the Borrower.

**Effective Date** means the date you accept the terms of this Agreement.

**Excess Payment** means a payment under this Agreement which exceeds the Outstanding Balance.

**Guarantor** means the guarantor(s), if any, of your obligations hereunder.

**Guarantee Agreement** means the guarantee agreement(s), if any, entered into by the Guarantor(s) on or about the date hereof.

**Indemnified Parties** means us and our successors, assigns, officers, directors, affiliates, employees, agents and representatives.

**Lien** means a security interest, lien, claim, charge, restriction, condition, option, right, mortgage, equity, pledge or encumbrance of any kind or nature whatsoever.

**Loan Fee** means the non-refundable fee payable to Lender pursuant to this Agreement, calculated by multiplying the original principal balance of the Loan by the percentage set out in Item #4 of the Cover Page.

**Loan** means the amount borrowed by Borrower pursuant to this Agreement, as such amount is set out in Item #4 of the Cover Page.

**Loan Remittances** means the product of the Repayment Rate multiplied by Settlement Amounts received from a Card Processor.

**Maturity Date** means: (i) in the case of a Six Month loan,

DocuSign Envelope ID: ████████████████████████

**American Express Merchant Financing**
**Business Loan and Security Agreement**                                    **SCHEDULE 1 – Definitions**

180 days from the Disbursement Date; (ii) in the case of a One Year loan, 365 days from the Disbursement Date; and, (iii) in the case of a Two Year loan, 730 days from the Disbursement Date.

**Maturity Date Notice** means the notice we provide to you specifying the Disbursement Date and Maturity Date of the Loan pursuant to this Agreement.

**Maximum Rate** means the maximum rate of interest which Lender may lawfully charge under applicable law.

**Minimum Payment** means the minimum cumulative payment specified in the Payment Schedule.

**Other Network Cards** means all forms of bank cards and other payment devices used by you for electronic transactions (whether or not such devices were in use when this Agreement was made), including credit, debit, charge, smart, electronic benefit transfer, contactless and RFID-enabled cards, but for the avoidance of doubt, not including Amex Cards.

**Other Network Settlement Amounts** means all proceeds, settlements, payments or other amounts that you receive with respect to Other Network Cards, but for the avoidance of doubt, not including Amex Settlement Amounts.

**Outstanding Balance** means, at any point in time, the sum of the principal amount of the Loan, the Loan Fee and all other amounts, in each case, which remain unpaid under this Agreement.

**Parties** means Lender, Borrower(s) and Principal(s) (each, a "Party").

**Payment Schedule** means the cumulative payment schedule included in the Maturity Date Notice.

**Principal** means one of your owners, shareholders, partners, members, principals, officers, directors or employees.

**Repayment Account(s)** means the bank account(s) either as indicated in your application or as listed in Schedule 3, as applicable.

**Repayment Amount** means the amount, as set out initially in Item #6 of the Cover Page, which is debited from the Repayment Accounts on each Business Day to repay your Loan, which amount may be adjusted in accordance with this Agreement.

**Repayment Rate** means the rate, as set out initially in Item #6 of the Cover Page, which is applied to your daily Settlement Amounts to produce Loan Remittances to repay your Loan, which rate may be adjusted from time to time in accordance with this Agreement.

**Schedule** means the relevant schedule(s), as selected on the Cover Page and attached to this Agreement, and as set out in the header of such page(s).

**Settlement Amounts** means (i) if your Loan is Amex Only, Amex Settlement Amounts and (ii) otherwise, Other Network Settlement Amounts together with Amex Settlement Amounts.

**Signature Page** means the signature page, as set out in the header of such page(s).

**Signing Principal** means each Principal that has executed this Agreement.

**Split Funding Instruction** means the payment instruction set out on Schedule 3 directing a Card Processor regarding the provision of a portion of Settlement Amounts to us.

**Term** means the term of this Agreement, which begins on the Effective Date and ends on the Maturity Date, or an earlier date if this Agreement is terminated prior to the Maturity Date in accordance with its terms.

**Terms and Conditions** means the terms and conditions of this Agreement, as set out in the header of each such page.

**Transfer Account** means an account opened by Lender (or its designee), with Wells Fargo Bank, N.A. and titled in the name of Lender (or its designee), for your benefit.

**Transfer Funds** means all funds collected and available in the Transfer Account.

DocuSign Envelope ID: ███████████████████████

**American Express Merchant Financing**

**Business Loan and Security Agreement**                    <u>**SCHEDULE 1**</u> **– Definitions**

**UCC** means the Uniform Commercial Code.

**Withholding Loan** means a Loan which is to be repaid through applying a percentage of daily Settlement Amounts to the Outstanding Balance.

**you/your** means the Borrower or, if there is more than one Borrower, the Borrowers, jointly and severally.

**we/us/our** means the Lender and its successors or assigns, including any Assignee.

**American Express Merchant Financing**

**Business Loan and Security Agreement**                                    <u>SCHEDULE 2 – Events of Default</u>

Each of the following will constitute an "<u>Event of Default</u>" under this Agreement:

### Business Slowdown

1.  as of any measuring date, your total sales, total revenue, Settlement Amounts or the total deposits into your deposit accounts, in each case, for any monthly, rolling three (3) month or rolling twelve (12) month period during the Term, have dropped by more than 25% as compared to the same period during the immediately preceding year;

2.  for seven (7) consecutive days we did not receive any (i) Settlement Amounts or (ii) if we had been receiving Loan Remittances from both Amex Settlement Amounts and Other Network Settlement Amounts, Amex Settlement Amounts or Other Network Settlement Amounts;

3.  on the Maturity Date there is an Outstanding Balance;

### Loan Repayment

1.  for seven (7) consecutive days we did not receive any loan repayments;

2.  <u>Only if you have a Withholding Loan</u>: any amount due and owing to us under this Agreement is thirty (30) or more days past due;

3.  <u>Only if you have a Withholding Loan</u>: you fail to pay any amount you owe us under this Agreement including, without limitation, when an ACH debit for any amount is rejected;

4.  <u>Only if you have a Debit ACH Loan</u>: attempts to debit your Repayment Account(s) have been rejected three (3) times during the Term (i) for insufficient funds or (ii) for any other reason;

5.  If any of your payments are rejected or returned including but not limited to: (i) your financial institution either revokes or cancels our ability to debit any of your deposit accounts, (ii) you revoke any ACH debits from any of your deposit accounts, or (iii) a check is returned;

6.  If you cancel or change your repayment mechanics, without our prior signed consent, including but not limited to utilizing the services of a Card Processor, other than as set forth in the Agreement, to process all or a portion of your Settlement Amounts.

### Business Entity/Guarantor

1.  your or any of your affiliates' merchant account number is cancelled by us, any Card Processor or by any of our affiliates;

2.  you or any Guarantor: (i) legally dissolve, are adjudicated insolvent or cease to pay your debts as they mature, (ii) make a general assignment for the benefit of or enter into an arrangement with creditors, (iii) apply for or consent to the appointment of a receiver, trustee or liquidator of you or a substantial part of your property, (iv) become subject to, voluntarily or involuntarily, a petition in bankruptcy or under any similar law; (v) take any step to effectuate any of the foregoing (i)-(iv); or (vi) if an individual, die or become legally incompetent;

3.  you change your place of business, legal name, entity type or state of formation; you fail to remain duly organized, licensed and validly existing; you sell or otherwise transfer your business without our prior signed consent;

### Undesirable Actions

1.  you revoke our access to any monitoring service for which you previously granted us access, other than with our prior signed consent;

2.  a Lien (including a tax lien) attaches to your business (including but not limited to your Settlement Amounts) or to that of any Guarantor, or you sell, assign or factor, or commit to any of the foregoing, your Settlement Amounts other than to us and in any case, you have not received our prior signed consent;

3.  any warranty, representation or statement made or furnished to us by you or any Signing Principal or on your or any Signing Principal's behalf under this Agreement is or becomes false or misleading in any material respect;

**American Express Merchant Financing**

**Business Loan and Security Agreement**                                          <u>SCHEDULE 2 – Events of Default</u>

4.   you take on additional indebtedness, without our prior signed consent which, in our sole but reasonable discretion, diminishes your capacity to repay the Loan under this Agreement;

### Events Indicating Credit Risk

1.   you, the Guarantor or any of your affiliates default under any other agreement with us, any Assignee or any affiliate of either us or any Assignee (including, without limitation, the Card Acceptance Agreement), or under any agreement with any third party material to your business or providing for the lease of real or personal property or the repayment of money borrowed;

2.   there is a positive debit balance on your Amex merchant account or the Amex merchant account of any of your affiliates with respect to any Card;

3.   an adverse credit action is deemed necessary by us or any of our affiliates against you or any of your affiliates;

4.   your or the Guarantor's credit rating or credit score is downgraded or a risk alert is generated, in any case, by any third party credit reporting service (<u>e.g.</u>, Experian, D&B or Equifax) or by us;

5.   an event or change has occurred that has caused, or could reasonably be expected to cause, a material adverse effect on the financial condition, business or operations of you or the Guarantor;

### Other

1.   you fail to perform or comply with any other term, provision, condition, covenant or agreement contained in this Agreement or any other documentation related to this Agreement;

2.   this Agreement, or any Guarantee Agreement, ceases to be in full force and effect at any time and for any reason;

3.   we reasonably deem ourselves insecure with respect to your performance hereunder; or

4.   any of the preceding events occurs with respect to any guarantor, endorser, surety, or accommodation party of any of your obligations hereunder.

For purposes of this Schedule 2, total sales, total revenue and total deposits will be based on best available data which is available to us. Our estimate will be deemed final and determinative as to the occurrence of an Event of Default.

**American Express Merchant Financing**
**Business Loan and Security Agreement**                  <u>SCHEDULE 3</u> **– Repayment (Transfer Account)**

You agree to the following terms:

**Payment through Amex Settlement Amounts.** (a) If AETRS is processing your Amex Cards pursuant to your Card Acceptance Agreement with our affiliate, AETRS, (i) you hereby authorize and direct us to contact AETRS and, notwithstanding anything to the contrary in the Card Acceptance Agreement, instruct AETRS to remit to us the Loan Remittances relating to Amex Cards (as adjusted from time to time in accordance with this Agreement), rather than to disburse such amounts to you and (ii) we will receive through your Card Processor in the Transfer Account the Other Network Settlement Amounts. Subject to the terms and conditions of this Agreement and except as otherwise provided herein, we will pay to you to the Designated Account all Other Network Settlement Amounts received in the Transfer Account (subject in all cases to a minimum amount of Transfer Funds held in deposit as reserve in the Transfer Account, as may be adjusted by us from time to time, the ("Minimum Account Balance")) less the Repayment Rate of such Other Network Settlement Amounts; provided that, notwithstanding anything in this Agreement or your agreement with your Card Processor to the contrary, you acknowledge and agree that (x) such amounts paid to you with respect to the Other Network Settlement Amounts may be delayed by one (1) or more Business Days and that we have no liability for such delay, (y) debits from the Transfer Account made by your Card Processor may reduce the funds available for payment of the Loans and distribution to you, and (z) we will have no liability for any failure, refusal, or delay of any third party processor to make payment into the Transfer Account, or

(b) If AETRS is not processing your Amex Cards, we will receive through your Card Processor in the Transfer Account the Settlement Amounts. Subject to the terms and conditions of this Agreement and except as otherwise provided herein, we will pay to you to the Designated Account all Settlement Amounts received in the Transfer Account (subject in all cases to the Minimum Account Balance) less the Repayment Rate of such Settlement Amounts; provided that, notwithstanding anything in this Agreement or your agreement with your Card Processor to the contrary, you acknowledge and agree that (x) such

amounts paid to you with respect to the Settlement Amounts may be delayed by one (1) or more Business Days and that we have no liability for such delay, (y) debits from the Transfer Account made by your Card Processor may reduce the funds available for payment of the Loans and distribution to you, and (z) we will have no liability for any failure, refusal, or delay of any third party processor to make payment into the Transfer Account.

These repayment mechanics will be in place until such time as we have received the entire Outstanding Balance; such authorization, instruction and direction being coupled with an interest and irrevocable until all of your obligations hereunder have been indefeasibly and fully paid and performed. You may not revoke this authorization and instruction without our prior signed consent. You waive any claim for damages you may have against us or our affiliates in connection with actions taken based on such instructions. You acknowledge and agree that all amounts we receive attributable to your Settlement Amounts will arise from bona fide sales by you of your goods and services to customers who present Cards as payment.

**Repayment Rate.** The initial Repayment Rate is set forth in Item #6 of the Cover Page. During the Term, Lender reserves the right in its sole but reasonable discretion to change the Repayment Rate (whether up or down) to that percentage necessary to ensure the Borrower meets each Minimum Payment contained in the Payment Schedule.

**Payment Schedule.** Unless accelerated pursuant to Article 9 (Remedies), the Loan, together with the Loan Fees, are due and payable in accordance with the Payment Schedule. The Payment Schedule constitutes a part of and is incorporated into this Agreement. An estimated cumulative payment schedule is attached hereto as <u>Schedule 4</u>. For the avoidance of doubt, the cumulative payment schedule set forth in <u>Schedule 4</u> is only an estimate; you are obligated to repay the Loan, together with the Loan Fees, in accordance with the Payment Schedule that will be provided to you in the Maturity Date Notice.

(Schedule continues)

DocuSign Envelope ID: ▮▮▮▮▮▮▮▮▮

**American Express Merchant Financing**

**Business Loan and Security Agreement**                    SCHEDULE 3 – Repayment (Transfer Account)

**Transfer Account.** You hereby (i) authorize us, or our designee, to open an account with Wells Fargo Bank, N.A. titled in our name, or the name of our designee, for your benefit and (ii) agree to provide to us and to Wells Fargo Bank, N.A. all information, documents and agreements and take any other actions required by federal regulations, Wells Fargo Bank, N.A. procedure or otherwise to open the Transfer Account. Banking details for the Transfer Account are listed below. For the avoidance of doubt, you will have no right to, or right of ownership in, the Transfer Account or the Transfer Funds at any time. If this Agreement is executed and delivered prior to the opening of the Transfer Account, if Settlement Accounts are not received in the Transfer Account within 30 days of the date of this Agreement, then this Agreement may be terminated immediately upon notice by us to you in accordance with the terms of this Agreement and upon such termination, the Outstanding Balance, if any, is immediately due and payable in full in accordance with the terms of this Agreement.

**Forwarding Settlement Amounts.** You have instructed, and will cause, your Card Processors to immediately forward all Settlement Amounts to the Transfer Account (however, if AETRS is processing your Amex Cards, you have instead instructed your Card Processors to immediately forward all Other Network Settlement Amounts to the Transfer Account). We may transfer the funds on deposit in the Transfer Account to an account owned by us and commingled with our general funds and no such amounts will be deemed to be held in trust for your benefit. You hereby represent, warrant and agree that, all Settlement Amounts will immediately be paid to the Transfer Account (however, if AETRS is processing your Amex Cards, you instead represent, warrant and agree that, all Other Network Settlement Amounts will immediately be paid to the Transfer Account). If you receive any Settlement Amounts that should be paid to the Transfer Account, you will, promptly upon receipt and in any event within one (1) Business Day of receipt thereof, forward such Settlement Amounts directly to the Transfer Account in the form received, together with any necessary endorsements, in form and substance acceptable to us. Until so forwarded, such Settlement Amounts will be held in trust for our benefit. For the avoidance of doubt, all Transfer Funds will at all times be under our sole dominion and control, and you will have no right to withdraw, transfer, have control over the use of

or otherwise have access to, either the Transfer Account or the Transfer Funds at any time. No interest will be payable on the Transfer Funds. You and each Signing Principal hereby irrevocably authorize us (such authorization being coupled with an interest) to debit or otherwise withdraw (via the ACH system, electronic checks, wires or otherwise) any funds we are entitled to receive under this Agreement from the Transfer Account upon the occurrence of an Event of Default. This authorization may not be revoked until we have received the entire Outstanding Balance. You and each Signing Principal hereby further irrevocably authorize us (such authorization being coupled with an interest) to apply any funds we receive in the Transfer Account to the amounts you owe us in accordance with the terms and conditions of this Agreement, and this authorization may not be revoked until we have received the entire Outstanding Balance. Without limiting the generality of the foregoing, you and each Signing Principal hereby acknowledge and agree that funds received in the Transfer Account may be applied to the obligations owed to us under this Agreement in accordance with the terms set forth in Article 6 (*Repayment*) (and those schedules which are incorporated by reference).

**Minimum Account Balance.** The Settlement Amounts on deposit in the Transfer Account and constituting Transfer Funds will be subject at all times to a reserve in an amount no less than $500.00 (as may be adjusted from time to time under this Agreement). Borrower agrees that any and all initial Settlement Amounts received in the Transfer Account will be used to satisfy the required Minimum Account Balance. Notwithstanding anything in this Agreement to the contrary, you acknowledge and agree that if the amount of Transfer Funds on deposit in the Transfer Account at any time and from time to time does not meet or falls below the Minimum Account Balance, the Loans and the amounts paid to you with respect to the Settlement Amounts will be suspended or terminated, at the option of the Lender, unless and until the Minimum Account Balance in the Transfer Account is restored. Without limiting the foregoing, upon demand by the Lender, Borrower will deposit with the Lender (for further distribution to the Transfer Account) additional cash to restore the Minimum Account Balance at any time and from time to time.

DocuSign Envelope ID: ███████████████████

**American Express Merchant Financing**

**Business Loan and Security Agreement**                                **SCHEDULE 3 – Repayment (Transfer Account)**

**Fees, costs and expenses.** Borrower agrees to reimburse the Lender for all fees, costs and expenses incurred by the Lender in connection with the Transfer Account related to a rejected ACH transaction.

**Notices.** Notwithstanding anything to the contrary herein, you agree that notices related to the Transfer Account may be provided to you by electronic mail as set forth in Article 16 (*Notices*).

| BANKING INFORMATION FOR TRANSFER ACCOUNT | | |
|---|---|---|
| Bank name:  Wells Fargo Bank, N.A. | City:  Minneapolis | State:  Minnesota |
| ABA (Bank Routing) Number:  ██████ | DDA (Bank Account) Number:  ██████ | |

DocuSign Envelope ID: ███████████████

**American Express Merchant Financing**

**Business Loan and Security Agreement**                                    <u>SCHEDULE 4</u> **– Estimated Payment Schedule**

**Estimated Cumulative Repayment Schedule**

| Billing End Date | Total Payment Amount |
|:---:|:---:|
| 04-07-2019 | $21,979.17 |
| 05-07-2019 | $43,958.33 |
| 06-07-2019 | $65,937.50 |
| 07-07-2019 | $87,916.67 |
| 08-07-2019 | $109,895.83 |
| 09-07-2019 | $131,875.00 |
| 10-07-2019 | $153,854.17 |
| 11-07-2019 | $175,833.33 |
| 12-07-2019 | $197,812.50 |
| 01-07-2020 | $219,791.67 |
| 02-07-2020 | $241,770.83 |
| 03-07-2020 | $263,750.00 |

DocuSign Envelope ID: ███████████████

**American Express Merchant Financing**

Business Loan and Security Agreement                                    <u>SCHEDULE 5</u> – Card Processors

| Card Type | Name of Card Processor | Merchant Identification Number assigned to Borrower by Card Processor |
|---|---|---|
| VISA CARD, MASTER CARD, DISCOVER CARD, OTHER | PCS | ██████████ |
| VISA CARD, MASTER CARD, DISCOVER CARD, OTHER | PCS | ██████████ |
| VISA CARD, MASTER CARD, DISCOVER CARD, OTHER | ELAVON | ████████ |

DocuSign Envelope ID: ███████████████████

**American Express Merchant Financing**

**Business Loan and Security Agreement**                                                 **Funds Flow Estimate**

Date:  March 5, 2019

| BORROWER INFORMATION | |
|---|---|
| Business Legal Name: | GLEASON'S GYMNASTIC SCHOOL, INC. |
| Merchant#: | ████ 4137 |
| Existing Loan Agreement Financing ID#: | ████ 4137 ████ |
| New Loan Agreement Financing ID#: | ████ 4137 ████ |

The above-named merchant ("you") and American Express National Bank ("us" or "we") are party to that certain Business Loan and Security Agreement with Financing ID as listed above ("Existing Loan Agreement"). Upon the execution by you of a new Business Loan and Security Agreement with us ("New Loan Agreement"), any funds disbursed under the New Loan Agreement ("New Loan") will be applied as follows:

> **First,** to fully satisfy the Outstanding Balance (as defined in the Existing Loan Agreement) under the Existing Loan Agreement, and then,

> **Second,** all remaining amounts will be paid to you in accordance with the New Loan Agreement.

Below is an estimated funds flow schedule ("Funds Flow Schedule") detailing the allocation of funds under the New Loan Agreement. This Funds Flow Schedule is only an estimate; the actual disbursement detail will be available to you together with the Maturity Date Notice you receive in connection with the New Loan Agreement. You are obligated to repay the New Loan, together with the Loan Fees, in accordance with the New Loan Agreement.

| FUNDS FLOW SCHEDULE | |
|---|---|
| Outstanding Balance (as defined in the Existing Loan Agreement)* | $119,884.65 |
| New Loan amount | $250,000.00 |
| Amount of New Loan applied to Outstanding Balance | $119,884.65 |
| Amount of New Loan disbursed to Borrower* | $130,115.35 |

*Amounts as of the date hereof. Final amounts will depend on the Disbursement Date under the New Loan Agreement.

This Funds Flow Estimate shall be deemed to satisfy the notice of termination requirement under the Existing Loan Agreement.

Capitalized terms used but not defined herein shall have the meanings attributed to them in the New Loan Agreement.

By signing below, you acknowledge your receipt and understanding of this Funds Flow Estimate.

**BORROWER**

By:  *DocuSigned by:* Larry Gleason

Print Name:  LARRY GLEASON

Title:  Other Authorizing Officer



## Certificate Of Completion

Envelope Id: ███████████████████                                    Status: Completed
Subject: American Express Merchant Financing - Signing Loan Agreement SE# ████ 4137
Merchant SE Number:
Source Envelope:
Document Pages: 24                    Signatures: 2                  Envelope Originator:
Certificate Pages: 4                  Initials: 0                   Merchant Financing
AutoNav: Enabled                                                    World Financial Center
EnvelopeId Stamping: Enabled                                        200 Vesey Street
Time Zone: (UTC-05:00) Eastern Time (US & Canada)                   New York, NY  10285
                                                                    mfdocs@aexp.com
                                                                    IP Address: 202.0.116.87

## Record Tracking

Status: Original                     Holder: Merchant Financing     Location: DocuSign
        3/5/2019 1:34:41 PM                  mfdocs@aexp.com

| Signer Events | Signature | Timestamp |
|---|---|---|
| LARRY GLEASON ███████████████ Business Manager Security Level: Email, Account Authentication (None), Access Code | *LARRY GLEASON* Signature Adoption: Pre-selected Style Using IP Address: ███████████ | Sent: 3/5/2019 1:35:58 PM Viewed: 3/5/2019 5:48:57 PM Signed: 3/5/2019 5:51:29 PM |

Electronic Record and Signature Disclosure:
    Accepted: 3/5/2019 5:48:57 PM
    ID: ██████████████████████████

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Sylvester Gilmer Sylvester.Gilmer2@aexp.com Security Level: Email, Account Authentication (None) | **COPIED** | Sent: 3/5/2019 1:35:57 PM |
| Electronic Record and Signature Disclosure: Not Offered via DocuSign | | |
| sheetansh dengre Sheetansh.Dengre@aexp.com Security Level: Email, Account Authentication (None) | **COPIED** | Sent: 3/5/2019 1:35:57 PM |
| Electronic Record and Signature Disclosure: Not Offered via DocuSign | | |

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 3/5/2019 1:35:58 PM |
| Certified Delivered | Security Checked | 3/5/2019 5:48:57 PM |
| Signing Complete | Security Checked | 3/5/2019 5:51:29 PM |
| Completed | Security Checked | 3/5/2019 5:51:29 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 4/20/2019 19 AM
Parties agreed to: LARRY GLEASON

**YOUR CONSENT TO ELECTRONIC DELIVERY** ("Consent Statement")

In this Consent Statement, "we," "us," and "our" refer to American Express National Bank and its current and future affiliates. "You" and "your" refer to the person or persons giving this consent.

For purposes of this Consent Statement, the term "Covered Items" includes all agreements, documents, notices, disclosures, and other information related to the transaction we are entering into with you, whether provided now or in the future.

<u>Consent</u>

You give us your consent to electronically provide you the Covered Items, and also your general consent to use electronic records and signatures in connection with the Covered Items and our transaction with you ("Consent").  You also certify that you can access this information electronically to your satisfaction, and will provide to us and maintain a valid e-mail address.

You understand that by giving us your Consent, you may no longer receive such Covered Items in paper form and you accept any consequence of not reviewing the Covered Items in a timely manner.

<u>Duration of Consent</u>

Your Consent will remain effective until all of the following have occurred: (1) you or we have terminated all of our agreements with respect to the transaction; (2) you have satisfied all of your obligations under the agreements related to the transaction; and (3) we have no further need to communicate with you regarding the transaction or anything relating to it.

<u>Methods of Providing Covered Items</u>

In this document, "provide" means to deliver, make available, send, notify or similar term.  We may provide the Covered Items electronically through, or through any combination of: (1) any e-mail address you provide to us, (2) any secure message center we make available for communicating with you, (3) links provided to or via a website we designate, or (4) files, including those in PDF format, downloaded from a website we designate.  It is your responsibility to review the Covered Items promptly, so you can take appropriate action.

<u>Access to Paper Copies</u>

You may make copies of the Covered Items by printing or saving electronic copies at the time we provide the Covered Items to you for your review or signature.  If we deliver Covered Items to you via a website we designate, you may continue to access those Covered Items on the website for 30 calendar days after we first make them available to you.  You may also call us toll free at 1-855-298-1209 and ask for a paper copy of any Covered Item, and we will provide it to

you if we still have ready access to a copy.

**Our Right to Send Paper**

We reserve the right to provide any of the Covered Items in paper form at all times at our discretion even if you have given us Consent to provide the Covered Items electronically. For example, but without limitation, we may do this if we have a system outage or if we suspect fraud.

**System Requirements**

To access and retain the Covered Items, you must have a computing or communications device with:

» Working Internet access,
» An active email address,
» A Web browser that supports 128-bit encryption (such as Chrome®, Firefox®, Internet Explorer®, or Safari®),
» 16 MB of available memory (32 MB of RAM recommended),
» A program that can view, save and print PDF files (such as Adobe® Reader® 4.0 or higher), and
» A computer and an operating system capable of supporting all of the above. You will also need a printer if you wish to print out and retain records on paper, and electronic storage if you wish to retain records in electronic form.

To demonstrate you can access Covered Items in a PDF format, click here ("Test PDF" document). If you are unable to view the Test PDF document you need to install the necessary Adobe® Reader® software. You can download Adobe® Reader® by clicking here (clicking will open another browser window and take you to Adobe's website).

In some cases, you may also need a specific brand or type of device that can support a particular software application, including an application intended for particular mobile or handheld devices.

**Acknowledgement**
By providing us your Consent, you acknowledge and represent that:

»      You are consenting to the use of electronic signatures and records in connection with this transaction;
»      You have an active email address;
»      You are authorized to give this consent on behalf of both yourself and any legal entity you represent in this transaction, and
»      You are able to receive, access, store and view the information presented electronically via the methods described above.

Filing Number: 1030279100713
Date: 08/31/2018
Time: 1:07 PM
STATE OF MINNESOTA
Office: Office of the Minnesota
Secretary of State

# UCC1 - Original Filing - UCC Financing Statement

**RETURN ACKNOWLEDGEMENT TO:**
Qiang Xu CT Lien Solutions
330 N Brand Blvd, Suite 700
Glendale, CA  91203

## DEBTOR INFORMATION

**ORGANIZATION'S NAME**
GLEASON'S GYMNASTIC SCHOOL, INC.

| MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2015 SILVER BELL RD STE 180 | EAGAN | MN | 55122 | USA |

## SECURED PARTY INFORMATION

**ORGANIZATION'S NAME**
AMERICAN EXPRESS NATIONAL BANK

| MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 4315 South 2700 West | Salt Lake City | UT | 84184 | USA |

## COLLATERAL

All assets of the Debtor, whether now owned or  hereafter acquired or arising

## ADDITIONAL INFORMATION(IF ANY)

**TRUST DESIGNATION:** No Alternative

SBA Loan #6467037908

Doc #L-01-0975277-01

Application #3300657360

# LOAN AUTHORIZATION AND AGREEMENT (LA&A)

## *A PROPERLY SIGNED DOCUMENT IS REQUIRED <u>PRIOR</u> TO ANY DISBURSEMENT*

---

**<u>CAREFULLY READ THE LA&A</u>:**

This document describes the terms and conditions of your loan. It is your responsibility to comply with <u>ALL</u> the terms and conditions of your loan.

---

**<u>SIGNING THE LA&A</u>:**

All borrowers must sign the LA&A.

- Sign your name *exactly* as it appears on the LA&A. If typed incorrectly, you should sign with the correct spelling.
- If your middle initial appears on the signature line, sign with your middle initial.
- If a suffix appears on the signature line, such as Sr. or Jr., sign with your suffix.
- Corporate Signatories: Authorized representatives should sign the signature page.

*<u>Your signature represents your agreement to comply with the terms and conditions of the loan.</u>*

---

Exhibit B

Ref 50 30

SBA Loan #6467037908

## U.S. Small Business Administration

Economic Injury Disaster Loan

# LOAN AUTHORIZATION AND AGREEMENT

Date: 06.16.2020 (Effective Date)

On the above date, this Administration (SBA) authorized (under Section 7(b) of the Small Business Act, as amended) a Loan (SBA Loan #6467037908) to Gleason's Gymnastic School, Inc. (Borrower) of 2015 Silver Bell Road, Suite 180 Eagan Minnesota 55122 in the amount of one hundred and fifty thousand and 00/100 Dollars ($150,000.00), upon the following conditions:

<u>PAYMENT</u>

- Installment payments, including principal and interest, of $731.00 Monthly, will begin Twelve (12) months from the date of the promissory Note. The balance of principal and interest will be payable Thirty (30) years from the date of the promissory Note.

<u>INTEREST</u>

- Interest will accrue at the rate of 3.75% per annum and will accrue only on funds actually advanced from the date(s) of each advance.

<u>PAYMENT TERMS</u>

- Each payment will be applied first to interest accrued to the date of receipt of each payment, and the balance, if any, will be applied to principal.

- Each payment will be made when due even if at that time the full amount of the Loan has not yet been advanced or the authorized amount of the Loan has been reduced.

<u>COLLATERAL</u>

- For loan amounts of greater than $25,000, Borrower hereby grants to SBA, the secured party hereunder, a continuing security interest in and to any and all "Collateral" as described herein to secure payment and performance of all debts, liabilities and obligations of Borrower to SBA hereunder without limitation, including but not limited to all interest, other fees and expenses (all hereinafter called "Obligations"). The Collateral includes the following property that Borrower now owns or shall acquire or create immediately upon the acquisition or creation thereof: all tangible and intangible personal property, including, but not limited to: (a) inventory, (b) equipment, (c) instruments, including promissory notes (d) chattel paper, including tangible chattel paper and electronic chattel paper, (e) documents, (f) letter of credit rights, (g) accounts, including health-care insurance receivables and credit card receivables, (h) deposit accounts, (i) commercial tort claims, (j) general intangibles, including payment intangibles and software and (k) as-extracted collateral as such terms may from time to time be defined in the Uniform Commercial Code. The security interest Borrower grants includes all accessions, attachments, accessories, parts, supplies and replacements for the Collateral, all products, proceeds and collections thereof and all records and data relating thereto.

- For loan amounts of $25,000 or less, SBA is not taking a security interest in any collateral.

SBA Form 1391 (5-00)

SBA Loan #6467037908                                                          Application #3300657360

## REQUIREMENTS RELATIVE TO COLLATERAL

- Borrower will not sell or transfer any collateral (except normal inventory turnover in the ordinary course of business) described in the "Collateral" paragraph hereof without the prior written consent of SBA.

- Borrower will neither seek nor accept future advances under any superior liens on the collateral securing this Loan without the prior written consent of SBA.

## USE OF LOAN PROCEEDS

- Borrower will use all the proceeds of this Loan solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020 and continuing thereafter and to pay Uniform Commercial Code (UCC) lien filing fees and a third-party UCC handling charge of $100 which will be deducted from the Loan amount stated above.

## REQUIREMENTS FOR USE OF LOAN PROCEEDS AND RECEIPTS

- Borrower will obtain and itemize receipts (paid receipts, paid invoices or cancelled checks) and contracts for all Loan funds spent and retain these receipts for 3 years from the date of the final disbursement. Prior to each subsequent disbursement (if any) and whenever requested by SBA, Borrower will submit to SBA such itemization together with copies of the receipts.

- Borrower will not use, directly or indirectly, any portion of the proceeds of this Loan to relocate without the prior written permission of SBA. The law prohibits the use of any portion of the proceeds of this Loan for voluntary relocation from the business area in which the disaster occurred. To request SBA's prior written permission to relocate, Borrower will present to SBA the reasons therefore and a description or address of the relocation site. Determinations of (1) whether a relocation is voluntary or otherwise, and (2) whether any site other than the disaster-affected location is within the business area in which the disaster occurred, will be made solely by SBA.

- Borrower will, to the extent feasible, purchase only American-made equipment and products with the proceeds of this Loan.

- Borrower will make any request for a loan increase for additional disaster-related damages as soon as possible after the need for a loan increase is discovered. The SBA will not consider a request for a loan increase received more than **two (2)** years from the date of loan approval unless, in the sole discretion of the SBA, there are extraordinary and unforeseeable circumstances beyond the control of the borrower.

## DEADLINE FOR RETURN OF LOAN CLOSING DOCUMENTS

- **Borrower will sign and return the loan closing documents to SBA within 2 months of the date of this Loan Authorization and Agreement**. By notifying the Borrower in writing, SBA may cancel this Loan if the Borrower fails to meet this requirement. The Borrower may submit and the SBA may, in its sole discretion, accept documents after 2 months of the date of this Loan Authorization and Agreement.

## COMPENSATION FROM OTHER SOURCES

- Eligibility for this disaster Loan is limited to disaster losses that are not compensated by other sources. Other sources include but are not limited to: (1) proceeds of policies of insurance or other indemnifications, (2) grants or other reimbursement (including loans) from government agencies or private organizations, (3)

SBA Form 1391 (5-00)                                                          Ref 50 30

SBA Loan #6467037908

Doc #L-01-0975277-01

Application #3300657360

claims for civil liability against other individuals, organizations or governmental entities, and (4) salvage (including any sale or re-use) of items of damaged property.

- Borrower will promptly notify SBA of the existence and status of any claim or application for such other compensation, and of the receipt of any such compensation, and Borrower will promptly submit the proceeds of same (not exceeding the outstanding balance of this Loan) to SBA.

- Borrower hereby assigns to SBA the proceeds of any such compensation from other sources and authorizes the payor of same to deliver said proceeds to SBA at such time and place as SBA shall designate.

- SBA will in its sole discretion determine whether any such compensation from other sources is a duplication of benefits. SBA will use the proceeds of any such duplication to reduce the outstanding balance of this Loan, and Borrower agrees that such proceeds will not be applied in lieu of scheduled payments.

## DUTY TO MAINTAIN HAZARD INSURANCE

- Within 12 months from the date of this Loan Authorization and Agreement the Borrower will provide proof of an active and in effect hazard insurance policy including fire, lightning, and extended coverage on all items used to secure this loan to at least 80% of the insurable value. Borrower will not cancel such coverage and will maintain such coverage throughout the entire term of this Loan. **BORROWER MAY NOT BE ELIGIBLE FOR EITHER ANY FUTURE DISASTER ASSISTANCE OR SBA FINANCIAL ASSISTANCE IF THIS INSURANCE IS NOT MAINTAINED AS STIPULATED HEREIN THROUGHOUT THE ENTIRE TERM OF THIS LOAN.** Please submit proof of insurance to: U.S. Small Business Administration, Office of Disaster Assistance, 14925 Kingsport Rd, Fort Worth, TX. 76155.

## BOOKS AND RECORDS

- Borrower will maintain current and proper books of account in a manner satisfactory to SBA for the most recent 5 years until 3 years after the date of maturity, including extensions, or the date this Loan is paid in full, whichever occurs first. Such books will include Borrower's financial and operating statements, insurance policies, tax returns and related filings, records of earnings distributed and dividends paid and records of compensation to officers, directors, holders of 10% or more of Borrower's capital stock, members, partners and proprietors.

- Borrower authorizes SBA to make or cause to be made, at Borrower's expense and in such a manner and at such times as SBA may require: (1) inspections and audits of any books, records and paper in the custody or control of Borrower or others relating to Borrower's financial or business conditions, including the making of copies thereof and extracts therefrom, and (2) inspections and appraisals of any of Borrower's assets.

- Borrower will furnish to SBA, not later than 3 months following the expiration of Borrower's fiscal year and in such form as SBA may require, Borrower's financial statements.

- Upon written request of SBA, Borrower will accompany such statements with an 'Accountant's Review Report' prepared by an independent public accountant at Borrower's expense.

- Borrower authorizes all Federal, State and municipal authorities to furnish reports of examination, records and other information relating to the conditions and affairs of Borrower and any desired information from such reports, returns, files, and records of such authorities upon request of SBA.

SBA Form 1391 (5-00)

Ref 50 30

SBA Loan #6467037908                                                          Application #3300657360

## LIMITS ON DISTRIBUTION OF ASSETS

- Borrower will not, without the prior written consent of SBA, make any distribution of Borrower's assets, or give any preferential treatment, make any advance, directly or indirectly, by way of loan, gift, bonus, or otherwise, to any owner or partner or any of its employees, or to any company directly or indirectly controlling or affiliated with or controlled by Borrower, or any other company.

## EQUAL OPPORTUNITY REQUIREMENT

- If Borrower has or intends to have employees, Borrower will post SBA Form 722, Equal Opportunity Poster (copy attached), in Borrower's place of business where it will be clearly visible to employees, applicants for employment, and the general public.

## DISCLOSURE OF LOBBYING ACTIVITIES

- Borrower agrees to the attached Certification Regarding Lobbying Activities

## BORROWER'S CERTIFICATIONS

Borrower certifies that:

- There has been no substantial adverse change in Borrower's financial condition (and organization, in case of a business borrower) since the date of the application for this Loan. (Adverse changes include, but are not limited to: judgment liens, tax liens, mechanic's liens, bankruptcy, financial reverses, arrest or conviction of felony, etc.)

- No fees have been paid, directly or indirectly, to any representative (attorney, accountant, etc.) for services provided or to be provided in connection with applying for or closing this Loan, other than those reported on SBA Form 5 Business Disaster Loan Application'; SBA Form 3501 COVID-19 Economic Injury Disaster Loan Application; or SBA Form 159, 'Compensation Agreement'. All fees not approved by SBA are prohibited.

- All representations in the Borrower's Loan application (including all supplementary submissions) are true, correct and complete and are offered to induce SBA to make this Loan.

- No claim or application for any other compensation for disaster losses has been submitted to or requested of any source, and no such other compensation has been received, other than that which Borrower has fully disclosed to SBA.

- Neither the Borrower nor, if the Borrower is a business, any principal who owns at least 50% of the Borrower, is delinquent more than 60 days under the terms of any: (a) administrative order; (b) court order; or (c) repayment agreement that requires payment of child support.

- Borrower certifies that no fees have been paid, directly or indirectly, to any representative (attorney, accountant, etc.) for services provided or to be provided in connection with applying for or closing this Loan, other than those reported on the Loan Application. All fees not approved by SBA are prohibited. If an Applicant chooses to employ an Agent, the compensation an Agent charges to and that is paid by the Applicant must bear a necessary and reasonable relationship to the services actually performed and must be comparable to those charged by other Agents in the geographical area. Compensation cannot be contingent on loan approval. In addition, compensation must not include any expenses which are deemed by SBA to be unreasonable for services actually performed or expenses actually incurred. Compensation must not include

SBA Form 1391 (5-00)                                                          Ref 50 30

charges prohibited in 13 CFR 103 or SOP 50-30, Appendix 1. **If the compensation exceeds $500 for a disaster home loan or $2,500 for a disaster business loan, Borrower must fill out the Compensation Agreement Form 159D which will be provided for Borrower upon request or can be found on the SBA website.**

- Borrower certifies, to the best of its, his or her knowledge and belief, that the certifications and representations in the attached Certification Regarding Lobbying are true, correct and complete and are offered to induce SBA to make this Loan.

## CIVIL AND CRIMINAL PENALTIES

- Whoever wrongfully misapplies the proceeds of an SBA disaster loan shall be civilly liable to the Administrator in an amount equal to one-and-one half times the original principal amount of the loan under 15 U.S.C. 636(b). In addition, any false statement or misrepresentation to SBA may result in criminal, civil or administrative sanctions including, but not limited to: 1) fines, imprisonment or both, under 15 U.S.C. 645, 18 U.S.C. 1001, 18 U.S.C. 1014, 18 U.S.C. 1040, 18 U.S.C. 3571, and any other applicable laws; 2) treble damages and civil penalties under the False Claims Act, 31 U.S.C. 3729; 3) double damages and civil penalties under the Program Fraud Civil Remedies Act, 31 U.S.C. 3802; and 4) suspension and/or debarment from all Federal procurement and non-procurement transactions. Statutory fines may increase if amended by the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015.

## RESULT OF VIOLATION OF THIS LOAN AUTHORIZATION AND AGREEMENT

- If Borrower violates any of the terms or conditions of this Loan Authorization and Agreement, the Loan will be in default and SBA may declare all or any part of the indebtedness immediately due and payable. SBA's failure to exercise its rights under this paragraph will not constitute a waiver.

- A default (or any violation of any of the terms and conditions) of any SBA Loan(s) to Borrower and/or its affiliates will be considered a default of all such Loan(s).

## DISBURSEMENT OF THE LOAN

- Disbursements will be made by and at the discretion of SBA Counsel, in accordance with this Loan Authorization and Agreement and the general requirements of SBA.

- Disbursements may be made in increments as needed.

- Other conditions may be imposed by SBA pursuant to general requirements of SBA.

- Disbursement may be withheld if, in SBA's sole discretion, there has been an adverse change in Borrower's financial condition or in any other material fact represented in the Loan application, or if Borrower fails to meet any of the terms or conditions of this Loan Authorization and Agreement.

- **NO DISBURSEMENT WILL BE MADE LATER THAN 6 MONTHS FROM THE DATE OF THIS LOAN AUTHORIZATION AND AGREEMENT UNLESS SBA, IN ITS SOLE DISCRETION, EXTENDS THIS DISBURSEMENT PERIOD.**

DocuSign Envelope ID: E039E63B-7264-4EAA-840D-4B8E483D2981

Doc #L-01-0975277-01

SBA Loan #6467037908                                                                 Application #3300657360

## PARTIES AFFECTED

- This Loan Authorization and Agreement will be binding upon Borrower and Borrower's successors and assigns and will inure to the benefit of SBA and its successors and assigns.

## RESOLUTION OF BOARD OF DIRECTORS

- Borrower shall, within 180 days of receiving any disbursement of this Loan, submit the appropriate SBA Certificate and/or Resolution to the U.S. Small Business Administration, Office of Disaster Assistance, 14925 Kingsport Rd, Fort Worth, TX. 76155.

## ENFORCEABILITY

- This Loan Authorization and Agreement is legally binding, enforceable and approved upon Borrower's signature, the SBA's approval and the Loan Proceeds being issued to Borrower by a government issued check or by electronic debit of the Loan Proceeds to Borrower' banking account provided by Borrower in application for this Loan.

*James E. Rivera*

James E. Rivera
Associate Administrator
U.S. Small Business Administration

The undersigned agree(s) to be bound by the terms and conditions herein during the term of this Loan, and further agree(s) that no provision stated herein will be waived without prior written consent of SBA.  **Under penalty of perjury of the United States of America, I hereby certify that I am authorized to apply for and obtain a disaster loan on behalf of Borrower, in connection with the effects of the COVID-19 emergency.**

**Gleason's Gymnastic School, Inc.**

Date:  06.16.2020

Lawrence Gleason, Owner/Officer

Note: Corporate Borrowers must execute Loan Authorization and Agreement in corporate name, by a duly authorized officer. Partnership Borrowers must execute in firm name, together with signature of a general partner. Limited Liability entities must execute in the entity name by the signature of the authorized managing person.

SBA Form 1391 (5-00)                                                                                       Ref 50 30

SBA Loan #6467037908                                                    Application #3300657360

# CERTIFICATION REGARDING LOBBYING

For loans over $150,000, Congress requires recipients to agree to
the following:

1.  Appropriated funds may NOT be used for lobbying.

2.  Payment of non-federal funds for lobbying must be reported on Form
    SF-LLL.

3.  Language of this certification must be incorporated into all
    contracts and subcontracts exceeding $100,000.

4.  All contractors and subcontractors with contracts exceeding
    $100,000 are required to certify and disclose accordingly.

SBA Form 1391 (5-00)

DocuSign Envelope ID: E039F63D-7254-4EAA-840D-4B8E4B3D2981

Case 22-30690    Doc 8    Filed 05/04/22    Entered 05/04/22 12:06:24    Desc Main
Document    Page 46 of 68

SBA Loan #6467037908

Doc #: L-01-0975277-01

Application #3300657360

# CERTIFICATION REGARDING
# LOBBYING

*Certification for Contracts, Grants, Loans, and Cooperative*
*Agreements*

Borrower and all Guarantors (if any) certify, to the best of its, his or her knowledge and belief, that:

(1)    No Federal appropriated funds have been paid or will be paid, by or on behalf of the undersigned, to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with awarding of any Federal contract, the making of any Federal grant, the making of any Federal loan, the entering into of any cooperative agreement, and the extension, continuation, renewal, or modification of any Federal contract, grant, loan, or cooperative agreement.

(2)    If any funds other than Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency, a Member of Congress, an officer or employee of Congress, or an employee of a Member of Congress in connection with this Federal loan, the undersigned shall complete and submit Standard Form LLL, "Disclosure Form to Report Lobbying," in accordance with its instructions.

(3)    The undersigned shall require that the language of this certification be included in the award documents for all sub-awards at all tiers (including subcontracts, sub-grants, and contracts under grants, loans, and co-operative agreements) and that all sub-recipients shall certify and disclose accordingly.

This certification is a material representation of fact upon which reliance was placed when this transaction was made or entered into. Submission of this certification is a prerequisite for making or entering into this transaction imposed by Section 1352, Title 31, U.S. Code. Any person who fails to file the required certification shall be subject to a civil penalty of not less than $10,000.00 and not more than $100,000.00 for each such failure.

SBA Form 1391 (5-00)



This Statement of Policy is Posted

In Accordance with Regulations of the

# Small Business Administration

This Organization Practices

## Equal Employment Opportunity

**We do not discriminate on the ground of race, color, religion, sex, age, disability or national origin in the hiring, retention, or promotion of employees; nor in determining their rank, or the compensation or fringe benefits paid them.**

This Organization Practices

## Equal Treatment of Clients

**We do not discriminate on the basis of race, color, religion, sex, marital status, disability, age or national origin in services or accommodations offered or provided to our employees, clients or guests.**

**These policies and this notice comply with regulations of the United States Government.**

**Please report violations of this policy to:**

**Administrator**
**Small Business Administration**
**Washington, D.C. 20416**

   In order for the public and your employees to know their rights under 13 C.F.R Parts 112, 113, and 117, Small Business Administration Regulations, and to conform with the directions of the Administrator of SBA, this poster must be displayed where it is clearly visible to employees, applicants for employment, and the public.

   Failure to display the poster as required in accordance with SBA Regulations may be considered evidence of noncompliance and subject you to the penalties contained in those Regulations.

SBA FORM 722 (10-02) REF: SOP 9030    PREVIOUS EDITIONS ARE OBSOLETE        **U.S. GOVERNMENT PRINTING OFFICE: 1994 0- 153-346**

This form was electronically produced by Elite Federal Inc.

Federal Recycling Program        Printed on Recycled Paper



**Esta Declaración De Principios Se Publica**

**De Acuerdo Con Los Reglamentos De La**

Agencia Federal Para el Desarrollo de la Pequeña Empresa

**Esta Organización Practica**

# Igual Oportunidad De Empleo

**No discriminamos por razón de raza, color, religión, sexo, edad, discapacidad o nacionalidad en el empleo, retención o ascenso de personal ni en la determinación de sus posiciones, salarios o beneficios marginales.**

**Esta Organización Practica**

# Igualdad En El Trato A Su Clientela

**No discriminamos por razón de raza, color, religión, sexo, estado civil, edad, discapacidad o nacionalidad en los servicios o facilidades provistos para nuestros empleados, clientes o visitantes.**

**Estos principios y este aviso cumplen con los reglamentos del Gobierno de los Estados Unidos de América.**

**Favor de informar violaciones a lo aquí indicado a:**

> **Administrador**
> **Agencia Federal Para el Desarrollo de la**
> **Pequeña Empresa**
> **Washington, D.C. 20416**

**A fin de que el público y sus empleados conozcan sus derechos según lo expresado en las Secciones 112, 113 y 117 del Código de Regulaciaones Federales No. 13, de los Reglamentos de la Agencja Federal Para el Desarrollo de la Pequeña Empresa y de acuerdo con las instrucciones del Administrador de dicha agencia,**
**esta notificación debe fijarse en un lugar claramente visible para los empleados, solicitantes de empleo y público en general. No fijar esta notificación según lo requerido por los reglamentos de la Agencia Federal Para el Desarrollo de la Pequeña Empresa, puede ser interpretado como evidencia de falta de cumplimiento de los mismos y conllevará la ejecución de los castigos impuestos en estos reglamentos.**

SBA FORM 722 (10-02) REF: SOP 9030    PREVIOUS EDITIONS ARE OBSOLETE    **U.S. GOVERNMENT PRINTING OFFICE: 1994 0- 153-346**

This form was electronically produced by Elite Federal Inc.

Federal Recycling Program    Printed on Recycled Paper

# NOTE

## *A PROPERLY SIGNED NOTE IS REQUIRED <u>PRIOR</u> TO ANY DISBURSEMENT*

---

**<u>CAREFULLY READ THE NOTE</u>:** It is your promise to repay the loan.

- The Note is pre-dated. **DO NOT CHANGE THE DATE OF THE NOTE.**
- **<u>LOAN PAYMENTS</u>** will be due as stated in the Note.
- **ANY CORRECTIONS OR UNAUTHORIZED MARKS MAY VOID THIS DOCUMENT.**

---

**<u>SIGNING THE NOTE</u>:** All borrowers must sign the Note.

- Sign your name *<u>exactly</u>* as it appears on the Note. If typed incorrectly, you should sign with the correct spelling.
- If your middle initial appears on the signature line, sign with your middle initial.
- If a suffix appears on the signature line, such as Sr. or Jr., sign with your suffix.
- Corporate Signatories: Authorized representatives should sign the signature page.

DocuSign Envelope ID: E039E63D-735A-4EAA-840D-4B8E183D2991
Case 22-30690   Doc 8   Filed 05/04/22   Entered 05/04/22 12:06:24   Desc Main
Document   Page 50 of 68
Doc #L-01-0975277-01
SBA Loan #6467037908
Application #3300657360



| | U.S. Small Business Administration | Date: 06.16.2020 |
|---|---|---|
| | **NOTE** | **Loan Amount: $150,000.00** |
| | (SECURED DISASTER LOANS) | **Annual Interest Rate: 3.75%** |

**SBA Loan # 6467037908**                                              **Application #3300657360**

1. **PROMISE TO PAY:** In return for a loan, Borrower promises to pay to the order of SBA the amount of **one hundred and fifty thousand  and 00/100 Dollars ($150,000.00),** interest on the unpaid principal balance, and all other amounts required by this Note.

2. **DEFINITIONS: A)** "Collateral" means any property taken as security for payment of this Note or any guarantee of this Note. **B)** "Guarantor" means each person or entity that signs a guarantee of payment of this Note. **C)** "Loan Documents" means the documents related to this loan signed by Borrower, any Guarantor, or anyone who pledges collateral.

3. **PAYMENT TERMS:** Borrower must make all payments at the place SBA designates. Borrower may prepay this Note in part or in full at any time, without notice or penalty. Borrower must pay principal and interest payments of **$731.00** every **month** beginning **Twelve (12)** months from the date of the Note. SBA will apply each installment payment first to pay interest accrued to the day SBA receives the payment and will then apply any remaining balance to reduce principal. All remaining principal and accrued interest is due and payable **Thirty (30) years** from the date of the Note.

4. **DEFAULT:** Borrower is in default under this Note if Borrower does not make a payment when due under this Note, or if Borrower: **A)** Fails to comply with any provision of this Note, the Loan Authorization and Agreement, or other Loan Documents; **B)** Defaults on any other SBA loan; **C)** Sells or otherwise transfers, or does not preserve or account to SBA's satisfaction for, any of the Collateral or its proceeds; **D)** Does not disclose, or anyone acting on their behalf does not disclose, any material fact to SBA; **E)** Makes, or anyone acting on their behalf makes, a materially false or misleading representation to SBA; **F)** Defaults on any loan or agreement with another creditor, if SBA believes the default may materially affect Borrower's ability to pay this Note; **G)** Fails to pay any taxes when due; **H)** Becomes the subject of a proceeding under any bankruptcy or insolvency law; **I)** Has a receiver or liquidator appointed for any part of their business or property; **J)** Makes an assignment for the benefit of creditors; **K)** Has any adverse change in financial condition or business operation that SBA believes may materially affect Borrower's ability to pay this Note; **L)** Dies; **M)** Reorganizes, merges, consolidates, or otherwise changes ownership or business structure without SBA's prior written consent; or **N)** Becomes the subject of a civil or criminal action that SBA believes may materially affect Borrower's ability to pay this Note.

5. **SBA'S RIGHTS IF THERE IS A DEFAULT:** Without notice or demand and without giving up any of its rights, SBA may: **A)** Require immediate payment of all amounts owing under this Note; **B)** Have recourse to collect all amounts owing from any Borrower or Guarantor (if any); **C)** File suit and obtain judgment; **D)** Take possession of any Collateral; or **E)** Sell, lease, or otherwise dispose of, any Collateral at public or private sale, with or without advertisement.

6. **SBA'S GENERAL POWERS:** Without notice and without Borrower's consent, SBA may: **A)** Bid on or buy the Collateral at its sale or the sale of another lienholder, at any price it chooses; **B)** Collect amounts due under this Note, enforce the terms of this Note or any other Loan Document, and preserve or dispose of the Collateral. Among other things, the expenses may include payments for property taxes, prior liens, insurance, appraisals, environmental remediation costs, and reasonable attorney's fees and costs. If SBA incurs such expenses, it may demand immediate reimbursement from Borrower or add the expenses to the principal balance; **C)** Release anyone obligated to pay this Note; **D)** Compromise, release, renew, extend or substitute any of the Collateral; and **E)** Take any action necessary to protect the Collateral or collect amounts owing on this Note.

SBA FORM 147 B (5-00)

SBA Loan #6467037908

7.  **FEDERAL LAW APPLIES:** When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations. SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax, or liability. As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law.

8.  **GENERAL PROVISIONS: A)** All individuals and entities signing this Note are jointly and severally liable. **B)** Borrower waives all suretyship defenses. **C)** Borrower must sign all documents required at any time to comply with the Loan Documents and to enable SBA to acquire, perfect, or maintain SBA's liens on Collateral. **D)** SBA may exercise any of its rights separately or together, as many times and in any order it chooses. SBA may delay or forgo enforcing any of its rights without giving up any of them. **E)** Borrower may not use an oral statement of SBA to contradict or alter the written terms of this Note. **F)** If any part of this Note is unenforceable, all other parts remain in effect. **G)** To the extent allowed by law, Borrower waives all demands and notices in connection with this Note, including presentment, demand, protest, and notice of dishonor. Borrower also waives any defenses based upon any claim that SBA did not obtain any guarantee; did not obtain, perfect, or maintain a lien upon Collateral; impaired Collateral; or did not obtain the fair market value of Collateral at a sale. **H)** SBA may sell or otherwise transfer this Note.

9.  **MISUSE OF LOAN FUNDS:** Anyone who wrongfully misapplies any proceeds of the loan will be civilly liable to SBA for one and one- half times the proceeds disbursed, in addition to other remedies allowed by law.

10.  **BORROWER'S NAME(S) AND SIGNATURE(S):** By signing below, each individual or entity acknowledges and accepts personal obligation and full liability under the Note as Borrower.

**Gleason's Gymnastic School, Inc.**

_____
Lawrence Gleason, Owner/Officer

SBA FORM 147 B (5-00)

DocuSign Envelope ID: E039E63B-7354-4EAA-840D-4B8E4A3D2981

SBA Loan #6467037908

Doc #1-01-0975277-01

Application #3300657360

# <u>SECURITY AGREEMENT</u>

<u>Read this document carefully.</u> It grants the SBA a security interest (lien) in all the property described in paragraph 4.

This document is predated. DO NOT CHANGE THE DATE ON THIS DOCUMENT.

In Process

DocuSign Envelope ID: E039E63B-7254-4EAA-840D-4B8E483D2991

Case 22-30690    Doc 8    Filed 05/04/22    Entered 05/04/22 12:06:24    Desc Main
Document    Page 53 of 68

Doc #: L-01-0975277-01
Application #3300657360

SBA Loan #6467037908



## U.S. Small Business Administration
# SECURITY AGREEMENT

| SBA Loan #: | 6467037908 |
|---|---|
| Borrower: | Gleason's Gymnastic School, Inc. |
| Secured Party: | **The Small Business Administration, an Agency of the U.S. Government** |
| Date: | 06.16.2020 |
| Note Amount: | $150,000.00 |

1.   **DEFINITIONS.**

Unless otherwise specified, all terms used in this Agreement will have the meanings ascribed to them under the Official Text of the Uniform Commercial Code, as it may be amended from time to time, ("UCC"). "SBA" means the Small Business Administration, an Agency of the U.S. Government.

2.   **GRANT OF SECURITY INTEREST.**

For value received, the Borrower grants to the Secured Party a security interest in the property described below in paragraph 4 (the "Collateral").

3.   **OBLIGATIONS SECURED**.

This Agreement secures the payment and performance of: (a) all obligations under a Note dated 06.16.2020, made by Gleason's Gymnastic School, Inc. , made payable to Secured Lender, in the amount of  $150,000.00 ("Note"), including all costs and expenses (including reasonable attorney's fees), incurred by Secured Party in the disbursement, administration and collection of the loan evidenced by the Note; (b) all costs and expenses (including reasonable attorney's fees), incurred by Secured Party in the protection, maintenance and enforcement of the security interest hereby granted; (c) all obligations of the Borrower in any other agreement relating to the Note; and (d) any modifications, renewals, refinancings, or extensions of the foregoing obligations.

4.   **COLLATERAL DESCRIPTION.**

The Collateral in which this security interest is granted includes the following property that Borrower now owns or shall acquire or create immediately upon the acquisition or creation thereof: all tangible

and intangible personal property, including, but not limited to: (a) inventory, (b) equipment, (c) instruments, including promissory notes (d) chattel paper, including tangible chattel paper and electronic chattel paper, (e) documents, (f) letter of credit rights, (g) accounts, including health-care insurance receivables and credit card receivables, (h) deposit accounts, (i) commercial tort claims, (j) general intangibles, including payment intangibles and software and (k) as-extracted collateral as such terms may from time to time be defined in the Uniform Commercial Code. The security interest Borrower grants includes all accessions, attachments, accessories, parts, supplies and replacements for the Collateral, all products, proceeds and collections thereof and all records and data relating thereto.

5.    **RESTRICTIONS ON COLLATERAL TRANSFER.**

Borrower will not sell, lease, license or otherwise transfer (including by granting security interests, liens, or other encumbrances in) all or any part of the Collateral or Borrower's interest in the Collateral without Secured Party's written or electronically communicated approval, except that Borrower may sell inventory in the ordinary course of business on customary terms. Borrower may collect and use amounts due on accounts and other rights to payment arising or created in the ordinary course of business, until notified otherwise by Secured Party in writing or by electronic communication.

6.    **MAINTENANCE AND LOCATION OF COLLATERAL; INSPECTION; INSURANCE.**

Borrower must promptly notify Secured Party by written or electronic communication of any change in location of the Collateral, specifying the new location. Borrower hereby grants to Secured Party the right to inspect the Collateral at all reasonable times and upon reasonable notice. Borrower must: (a) maintain the Collateral in good condition; (b) pay promptly all taxes, judgments, or charges of any kind levied or assessed thereon; (c) keep current all rent or mortgage payments due, if any, on premises where the Collateral is located; and (d) maintain hazard insurance on the Collateral, with an insurance company and in an amount approved by Secured Party (but in no event less than the replacement cost of that Collateral), and including such terms as Secured Party may require including a Lender's Loss Payable Clause in favor of Secured Party. Borrower hereby assigns to Secured Party any proceeds of such policies and all unearned premiums thereon and authorizes and empowers Secured Party to collect such sums and to execute and endorse in Borrower's name all proofs of loss, drafts, checks and any other documents necessary for Secured Party to obtain such payments.

7.    **CHANGES TO BORROWER'S LEGAL STRUCTURE, PLACE OF BUSINESS, JURISDICTION OF ORGANIZATION, OR NAME.**

Borrower must notify Secured Party by written or electronic communication not less than 30 days before taking any of the following actions: (a) changing or reorganizing the type of organization or form under which it does business; (b) moving, changing its place of business or adding a place of business; (c) changing its jurisdiction of organization; or (d) changing its name. Borrower will pay for the preparation and filing of all documents Secured Party deems necessary to maintain, perfect and continue the perfection of Secured Party's security interest in the event of any such change.

8.    **PERFECTION OF SECURITY INTEREST.**

Borrower consents, without further notice, to Secured Party's filing or recording of any documents necessary to perfect, continue, amend or terminate its security interest. Upon request of Secured Party, Borrower must sign or otherwise authenticate all documents that Secured Party deems necessary at any time to allow Secured Party to acquire, perfect, continue or amend its security interest in the Collateral. Borrower will pay the filing and recording costs of any documents relating to Secured Party's security interest. Borrower ratifies all previous filings and recordings, including financing statements and

DocuSign Envelope ID: E039E63B-7250-4EAA-840D-4B8E483D2981

Case 22-30690   Doc 8   Filed 05/04/22   Entered 05/04/22 12:06:24   Desc Main
Document      Page 55 of 68

SBA Loan #6467037908

Doc #L-01-0975277-01

Application #3300657360

notations on certificates of title. Borrower will cooperate with Secured Party in obtaining a Control Agreement satisfactory to Secured Party with respect to any Deposit Accounts or Investment Property, or in otherwise obtaining control or possession of that or any other Collateral.

9.    **DEFAULT.**

Borrower is in default under this Agreement if: (a) Borrower fails to pay, perform or otherwise comply with any provision of this Agreement; (b) Borrower makes any materially false representation, warranty or certification in, or in connection with, this Agreement, the Note, or any other agreement related to the Note or this Agreement; (c) another secured party or judgment creditor exercises its rights against the Collateral; or (d) an event defined as a "default" under the Obligations occurs. In the event of default and if Secured Party requests, Borrower must assemble and make available all Collateral at a place and time designated by Secured Party. Upon default and at any time thereafter, Secured Party may declare all Obligations secured hereby immediately due and payable, and, in its sole discretion, may proceed to enforce payment of same and exercise any of the rights and remedies available to a secured party by law including those available to it under Article 9 of the UCC that is in effect in the jurisdiction where Borrower or the Collateral is located. Unless otherwise required under applicable law, Secured Party has no obligation to clean or otherwise prepare the Collateral for sale or other disposition and Borrower waives any right it may have to require Secured Party to enforce the security interest or payment or performance of the Obligations against any other person.

10.    **FEDERAL RIGHTS.**

When SBA is the holder of the Note, this Agreement will be construed and enforced under federal law, including SBA regulations. Secured Party or SBA may use state or local procedures for filing papers, recording documents, giving notice, enforcing security interests or liens, and for any other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax or liability. As to this Agreement, Borrower may not claim or assert any local or state law against SBA to deny any obligation, defeat any claim of SBA, or preempt federal law.

11.    **GOVERNING LAW.**

Unless SBA is the holder of the Note, in which case federal law will govern, Borrower and Secured Party agree that this Agreement will be governed by the laws of the jurisdiction where the Borrower is located, including the UCC as in effect in such jurisdiction and without reference to its conflicts of laws principles.

12.    **SECURED PARTY RIGHTS.**

All rights conferred in this Agreement on Secured Party are in addition to those granted to it by law, and all rights are cumulative and may be exercised simultaneously. Failure of Secured Party to enforce any rights or remedies will not constitute an estoppel or waiver of Secured Party's ability to exercise such rights or remedies. Unless otherwise required under applicable law, Secured Party is not liable for any loss or damage to Collateral in its possession or under its control, nor will such loss or damage reduce or discharge the Obligations that are due, even if Secured Party's actions or inactions caused or in any way contributed to such loss or damage.

13.    **SEVERABILITY.**

If any provision of this Agreement is unenforceable, all other provisions remain in effect.

SBA Form 1059 (09-19) Previous Editions are obsolete.

SBA Loan #6467037908                                                    Application #3300657360

14.   **BORROWER CERTIFICATIONS.**

Borrower certifies that: (a) its Name (or Names) as stated above is correct; (b) all Collateral is owned or titled in the Borrower's name and not in the name of any other organization or individual; (c) Borrower has the legal authority to grant the security interest in the Collateral; (d) Borrower's ownership in or title to the Collateral is free of all adverse claims, liens, or security interests (unless expressly permitted by Secured Party); (e) none of the Obligations are or will be primarily for personal, family or household purposes; (f) none of the Collateral is or will be used, or has been or will be bought primarily for personal, family or household purposes; (g) Borrower has read and understands the meaning and effect of all terms of this Agreement.

15.   **BORROWER NAME(S) AND SIGNATURE(S).**

By signing or otherwise authenticating below, each individual and each organization becomes jointly and severally obligated as a Borrower under this Agreement.


**Gleason's Gymnastic School, Inc.**


Date:   06.16.2020
_____

Lawrence Gleason, Owner/Officer


Page 5 of 5

Filing Number: 1168137301033
Date: 07/20/2020
Time: 9:26 PM
STATE OF MINNESOTA
Office: Office of the Minnesota
Secretary of State

# UCC1 - Original Filing - UCC Financing Statement

**RETURN ACKNOWLEDGEMENT TO:**
Corporation Service Company
**801 Stevenson Drive**
**Springfield, IL  62703**

## DEBTOR INFORMATION

**ORGANIZATION'S NAME**
Gleason's Gymnastic School, Inc.

| MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2015 Silver Bell Road, Suite 180 | Eagan | MN | 55122 | USA |

## SECURED PARTY INFORMATION

**ORGANIZATION'S NAME**
U.S. Small Business Administration

| MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 2 North Street, Suite 320 | Birmingham | AL | 35203 | USA |

## COLLATERAL

All tangible and intangible personal property, including, but not limited to: (a) inventory, (b) equipment, (c) instruments, including promissory notes (d) chattel paper, including tangible chattel paper and electronic chattel paper, (e) documents, (f) letter of credit rights, (g) accounts, including health-care insurance receivables and credit card receivables, (h) deposit accounts, (i) commercial tort claims, (j) general intangibles, including payment intangibles and software and (k) as-extracted collateral as such terms may from time to time be defined in the Uniform Commercial Code.  The security interest Borrower grants includes all accessions, attachments, accessories, parts, supplies and replacements for the Collateral, all products, proceeds and collections thereof and all records and data relating thereto.

646703 7908

## ADDITIONAL INFORMATION(IF ANY)

**TRUST DESIGNATION:** No Alternative

Description of collateral and values on date of filing and beginning of
Use of cash collateral and at end of cash collateral period

| | Value as of Filing date | Value as of End of 21 days | Value as of End of cash Collateral period (December 31, 2022) |
|---|---|---|---|
| **Current Assets**: | | | |
| Bank accounts (net) | $446,059.64 | $446,059.64 | $446,059.64 |
| Accounts Receivable | $11,816.88 | $11,816.88 | $11,816.88 |
| **Total current assets** | **$457,876.52** | **$457,876.52** | **$457,876.52** |
| **Property and Equipment** | | | |
| Pro shop inventory | $4,223.02 | $4,223.02 | $4,223.02 |
| Office equipment | $13,687.77 | $13,687.77 | $13,687.77 |
| Gymnastic equipment | $37,491.79 | $37,491.79 | $37,491.79 |
| Security deposits | $9,300.00 | $9,300.00 | $9,300.00 |
| **Total Property & Equipment** | **$64,702.58** | **$64,702.58** | **$64,702.58** |
| **TOTAL ASSETS** | **$522,579.10** | **$522,579.10** | **$522,579.10** |

Exhibit C

Gleason's Gymnastic School
Cash Flow Projections
Nov 2021 - Dec 2022

| GLEASON'S INCOME/EXPENSE PROJECTIONS | 2021 | | 2022 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | November | December | January | February | March | April | May | June | July | August | September | October | November | December |
| Cash Balance (starting 10/31) | $ 413,294.63 | $ 429,405.77 | $ 435,851.91 | $ 441,960.99 | $ 454,835.82 | $ 460,806.03 | $ 442,037.12 | $ 425,225.85 | $ 392,738.72 | $ 353,680.83 | $ 326,912.12 | $ 324,234.08 | $ 336,434.77 | $ 341,063.59 |
| | | | | | | | | | | | | | | |
| **Income** | | | | | | | | | | | | | | |
| Services | $ 129,872.76 | $ 129,872.76 | $ 139,872.76 | $ 139,872.76 | $ 139,872.76 | $ 114,097.17 | $ 101,810.94 | $ 85,400.38 | $ 75,875.57 | $ 91,791.52 | $ 121,767.31 | $ 145,718.44 | $ 134,571.57 | $ 126,296.67 |
| **Cost of Goods Sold** | | | | | | | | | | | | | | |
| COGS | $ 60,000.00 | $ 58,000.00 | $ 60,000.00 | $ 60,000.00 | $ 60,000.00 | $ 60,000.00 | $ 55,000.00 | $ 50,000.00 | $ 45,000.00 | $ 50,000.00 | $ 55,000.00 | $ 60,000.00 | $ 60,000.00 | $ 58,000.00 |
| **Gross Profit** | $ 69,872.76 | $ 71,872.76 | $ 79,872.76 | $ 79,872.76 | $ 79,872.76 | $ 54,097.17 | $ 46,810.94 | $ 35,400.38 | $ 30,875.57 | $ 41,791.52 | $ 66,767.31 | $ 85,718.44 | $ 74,571.57 | $ 68,296.67 |
| | | | | | | | | | | | | | | |
| **Expenses** | | | | | | | | | | | | | | |
| Payroll (Admin/Office) | $ 23,584.88 | $ 23,584.88 | $ 23,584.88 | $ 23,584.88 | $ 23,584.88 | $ 23,584.88 | $ 23,584.88 | $ 23,584.88 | $ 23,584.88 | $ 23,584.88 | $ 25,600.00 | $ 25,600.00 | $ 25,600.00 | $ 25,600.00 |
| Repairs & Maintenance | $ 279.88 | $ 279.88 | $ 279.88 | $ 279.88 | $ 279.88 | $ 279.88 | $ 279.88 | $ 279.88 | $ 279.88 | $ 279.88 | $ 279.88 | $ 279.88 | $ 279.88 | $ 279.88 |
| Rent Expense | $ 22,161.79 | $ 22,161.79 | $ 22,161.79 | $ 22,161.79 | $ 22,661.80 | $ 22,661.80 | $ 22,661.80 | $ 22,661.80 | $ 22,661.80 | $ 22,661.80 | $ 22,661.80 | $ 22,661.80 | $ 22,661.80 | $ 22,661.80 |
| Advertising | $ 75.00 | $ 75.00 | $ 75.00 | $ 75.00 | $ 75.00 | $ 75.00 | $ 75.00 | $ 75.00 | $ 75.00 | $ 75.00 | $ 75.00 | $ 75.00 | $ 75.00 | $ 75.00 |
| Retirement Contributions | $ - | $ - | $ - | $ - | $ 3,000.00 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Dues & Subscriptions | $ 100.00 | $ 100.00 | $ 2,100.00 | $ 100.00 | $ 100.00 | $ 2,100.00 | $ 100.00 | $ 400.00 | $ 2,400.00 | $ 400.00 | $ 400.00 | $ 2,400.00 | $ 200.00 | $ 100.00 |
| Gym Equipment | $ - | $ - | $ - | $ - | $ 1,500.00 | $ - | $ - | $ - | $ - | $ - | $ 1,500.00 | $ - | $ - | $ - |
| Gym Expense | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 | $ 1,000.00 |
| Insurance-Gym | $ 415.00 | $ - | $ 4,207.06 | $ 3,537.76 | $ 3,943.26 | $ 3,532.76 | $ 396.20 | $ 1,200.20 | $ - | $ - | $ - | $ 415.00 | $ - | $ - |
| Insurance-Workers Comp | $ 790.00 | $ - | $ - | $ 790.00 | $ - | $ - | $ 790.00 | $ 1,500.00 | $ - | $ 5,000.00 | $ - | $ - | $ 790.00 | $ - |
| Janitorial | $ 70.03 | $ 2,820.03 | $ 70.03 | $ 70.03 | $ 2,820.03 | $ 70.03 | $ 70.03 | $ 2,820.03 | $ 70.03 | $ 70.03 | $ 2,820.03 | $ 70.03 | $ 2,820.03 | $ 70.03 |
| Office Expense | $ 283.85 | $ 283.85 | $ 283.85 | $ 283.85 | $ 283.85 | $ 283.85 | $ 283.85 | $ 283.85 | $ 283.85 | $ 283.85 | $ 283.85 | $ 283.85 | $ 283.85 | $ 283.85 |
| Payroll Services | $ 840.00 | $ 840.00 | $ 840.00 | $ 840.00 | $ 840.00 | $ 840.00 | $ 840.00 | $ 840.00 | $ 840.00 | $ 840.00 | $ 840.00 | $ 840.00 | $ 840.00 | $ 840.00 |
| Postage | $ - | $ 120.00 | $ - | $ - | $ 120.00 | $ - | $ - | $ 120.00 | $ - | $ - | $ 120.00 | $ - | $ - | $ 120.00 |
| Professional Fees | $ - | $ - | $ 5,000.00 | $ - | $ - | $ 5,000.00 | $ - | $ - | $ 5,000.00 | $ - | $ - | $ 5,000.00 | $ - | $ - |
| Technology | $ 1,400.00 | $ 1,400.00 | $ 1,400.00 | $ 1,400.00 | $ 1,400.00 | $ 1,400.00 | $ 1,400.00 | $ 1,400.00 | $ 1,400.00 | $ 1,400.00 | $ 1,400.00 | $ 1,400.00 | $ 1,400.00 | $ 1,400.00 |
| Telecommunications | $ 635.00 | $ 635.00 | $ 635.00 | $ 635.00 | $ 635.00 | $ 635.00 | $ 635.00 | $ 635.00 | $ 635.00 | $ 635.00 | $ 635.00 | $ 635.00 | $ 635.00 | $ 635.00 |
| Travel | $ - | $ - | $ - | $ 500.00 | $ - | $ - | $ 500.00 | $ - | $ - | $ 500.00 | $ - | $ - | $ 500.00 | $ - |
| Utilities | $ 1,931.31 | $ 1,931.31 | $ 1,931.31 | $ 1,544.86 | $ 1,463.97 | $ 1,208.00 | $ 810.69 | $ 891.99 | $ 777.14 | $ 903.91 | $ 903.91 | $ 1,931.31 | $ 1,931.31 | $ 1,931.31 |
| Waste Removal | $ 194.88 | $ 194.88 | $ 194.88 | $ 194.88 | $ 194.88 | $ 194.88 | $ 194.88 | $ 194.88 | $ 194.88 | $ 194.88 | $ 194.88 | $ 194.88 | $ 194.88 | $ 194.88 |
| **Total Expenses** | $ 53,761.62 | $ 55,426.62 | $ 63,763.68 | $ 56,997.93 | $ 63,902.55 | $ 62,866.08 | $ 53,622.21 | $ 57,887.51 | $ 59,202.46 | $ 57,829.23 | $ 58,714.35 | $ 62,786.75 | $ 59,211.75 | $ 55,191.75 |
| | | | | | | | | | | | | | | |
| **Net Income** | $ 16,111.14 | $ 16,446.14 | $ 16,109.08 | $ 22,874.83 | $ 15,970.21 | $ (8,768.91) | $ (6,811.27) | $ (22,487.13) | $ (28,326.89) | $ (16,037.71) | $ 8,052.96 | $ 22,931.69 | $ 15,359.82 | $ 13,104.92 |
| | | | | | | | | | | | | | | |
| **Cash Balance** | $ 429,405.77 | $ 445,851.91 | $ 451,960.99 | $ 464,835.82 | $ 470,806.03 | $ 452,037.12 | $ 435,225.85 | $ 402,738.72 | $ 364,411.83 | $ 337,643.12 | $ 334,965.08 | $ 347,165.77 | $ 351,794.59 | $ 354,168.51 |
| | | | | | | | | | | | | | | |
| **Payments** | | | | | | | | | | | | | | |
| Amex | $ - | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 |
| SBA Loan | | | | | | | | | $ 731.00 | $ 731.00 | $ 731.00 | $ 731.00 | $ 731.00 | $ 731.00 |
| Unsecured Debt | | | | | | | | | | | | | | |
| **Total Payments** | $ - | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,000.00 | $ 10,731.00 | $ 10,731.00 | $ 10,731.00 | $ 10,731.00 | $ 10,731.00 | $ 10,731.00 |
| | | | | | | | | | | | | | | |
| **Total Cash Remaining** | $ 429,405.77 | $ 435,851.91 | $ 441,960.99 | $ 454,835.82 | $ 460,806.03 | $ 442,037.12 | $ 425,225.85 | $ 392,738.72 | $ 353,680.83 | $ 326,912.12 | $ 324,234.08 | $ 336,434.77 | $ 341,063.59 | $ 343,437.51 |

Exhibit D

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

In re:

Case No. 22-30690

Gleason's Gymnastic School, Inc.,

## SEPARATE VERIFICATION OF CASH COLLATERAL AND EXHIBITS
## PURSUANT TO LOCAL RULE 4001-2(a)

Pursuant to Local Rule 4001-2(a), the undersigned hereby states under penalty of perjury that he is the CEO of the Debtor, that he has firsthand knowledge of the facts stated in Exhibits C and D attached to the pending Motion for Use of Cash Collateral by the Debtor and the facts set forth therein are true and correct to the best of his knowledge.

Dated: 5/4/2022

Lawrence Gleason

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

_____

In re:

Case No. 22-30690

Gleason's Gymnastic School, Inc.,
_____

**DECLARATION OF LAWRENCE GLEASON IN SUPPORT OF**
**NOTICE OF EXPEDITED HEARING AND MOTION AUTHORIZING**
**USE OF CASH COLLATERAL AND FOR ADEQUATE PROTECTION**
_____

1.      I am the CEO of the Debtor in the above-referenced bankruptcy case.

2.      I make this Unsworn Declaration in Support of the Debtor's Motion for Expedited Relief and Order Authorizing Use of Cash Collateral ("Motion").

3.      I am familiar with the Debtor's assets, debts and operations.

4.      The Debtor values its assets as of: (a) the Filing Date; (b) the date of the end of the period of time for which Debtor currently seeks authorization to use cash collateral, all as set forth in Exhibit C attached hereto.

5.      The Debtor need the use of cash collateral to pay operating expenses.

6.      The Debtor requires cash for the items and in the amounts specified on the attached Exhibit D, which is also attached to the Debtor's Motion.

7.      The Expenditures provided for in Exhibit D are the normal and necessary operating expenses of the Debtor that are necessary to avoid immediate and irreparable harm to the bankruptcy estate.

I declare under penalty of perjury that the foregoing is true and correct according to the best of my knowledge, information and belief.

Dated: 5/4/20 22

Lawrence Gleason

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

_____

In re:

Gleason's Gymnastic School, Inc.,

Case No. 22-30690

_____

### MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ORDERS
### (I) GRANTING EXPEDITED RELIEF AND (II) AUTHORIZING USE OF
### CASH COLLATERAL ON AN INTERIM AND FINAL BASIS

_____

Gleason's Gymnastic School, Inc., ("Debtor"), as debtor-in-possession, submit this memorandum in support of its motion for orders (I) granting expedited relief and (II) authorizing the Debtor to use cash collateral on an interim and final basis (the "Motion").

### BACKGROUND

The facts upon which the Debtor relies are set forth in the Debtor's Motion.

### ARGUMENT

### I.    CAUSE EXISTS TO REDUCE NOTICE ON HEARING ON THE INTERIM MOTION

Bankruptcy Rule 4001(b) provides that a court may commence a final hearing for authority to use cash collateral no earlier than fourteen (14) days after service of the motion.  The Rule further provides that a court may conduct a preliminary hearing before such fourteen (14) day period expires, but the court may authorize the use of cash collateral only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.  Fed. R. Bankr. P. 4001(b)(l){C)(2).   Local Rule 9006-l(e) permits the court to reduce the notice of the hearing.

In this case, grounds exist to reduce notice of the interim hearing to authorize the use of cash collateral on a preliminary basis pending the final hearing.  The Debtor has an

1

urgent need for the use of cash collateral to continue its operations uninterrupted.   The

Debtor must meet immediate obligations such as payroll obligations and ordinary business

expenses, including rent, payroll and other reasonable and necessary business expenses.   If

the Debtor loses employees or customers as a result of its inability to operate its business

without use of cash collateral, the value of its estate and the viability of ongoing operations

will be immediately and irreparably harmed, and recoveries for creditors will be

significantly reduced.   Cause therefore exists to reduce notice of the hearing on the interim

motion.

### II.      THE COURT SHOULD AUTHORIZE THE PROPOSED USE OF CASH COLLATERAL ON AN INTERIM AND FINAL BASIS

As debtor-in-possession, the Debtor is authorized to operate its business under the

Bankruptcy Code.  *See* 11 U.S.C. § 1108.  The Bankruptcy Code provides that a debtor-in-

possession may use cash collateral only with the secured creditor's consent or if the Court,

after notice and a hearing, authorizes such use.  *See* 11 U.S.C. § 363(c)(2).  Before use of

cash collateral is authorized, section 363(e) of the Bankruptcy Code provides that the Court

must provide the secured creditor with adequate protection of its interest upon request of

the creditor.

11 U.S.C. § 363(e). The Eighth Circuit Court of Appeals has reasoned that:

In any given case, the bankruptcy court must necessarily (1) establish the
value of the secured creditor's interest, (2) identify the risks to the secured
creditor's value resulting from the debtor's request for use of cash collateral,
and (3) determine whether the debtor's adequate protection proposal
protects value as nearly as possible against risks to that value consistent with
the concept of indubitable equivalence.

*In re Martin,* 761 F.2d 472,476-77 (8th Cir. 1985) (citation omitted).  Each of the *Martin*

factors will be discussed in turn.

2

Pursuant to *Martin,* the first step is to establish the value of the secured creditor's interest. The creditor's interest is determined by what the creditor would recover if the collateral were disposed of in the most commercially reasonable manner practicable. *In re Boring,* 91 B.R. 791, 795 (Bankr·. S.D. Ohio 1988); *United States v. Smithfield Estates, Inc. (In re Smithfield Estates, Inc.),* 48 B.R. 910, 912 (Bankr. D.R.I. 1985). With respect to this first requirement, as of the Petition Date, the Secured Party held liens securing obligations owed by the Debtor in the amount of approximately $188,699.72. As of that same date, the value of the Secured Creditor's collateral was approximately $575,400.

With respect to the second requirement, the only cognizable risk to the Secured Creditor would be that the Debtor might fail to generate replacement cash collateral to compensate for the use of existing cash collateral, and the Secured Creditor's secured position would thus deteriorate over time. The Debtor proposes to use cash collateral to maintain its existing operations, meet payroll obligations, and meet other operating expenses. The Debtor's operations are maintaining collateral values and should not decline. In the event the Debtor is not authorized to use cash collateral, its only alternative will be to discontinue operations immediately. Such a result will greatly impair the value of the Debtor's assets, thereby likely precluding unsecured creditors from receiving anything on account of their claims, and would be disruptive to the Debtor's customers, employees, and other parties in interest.

The third and final requirement of *Martin* requires the Court to examine a debtor's adequate protection proposal to determine that the proposal protects the value of the secured creditor's interest, if any, in the cash collateral relative to the risk to such value. 761 F.2d at 477. Here, the Debtor proposes to grant post-petition replacement liens to the

3

Secured Party of the same priority, dignity and effect as their prepetition interests in the Debtor's cash collateral.   According to the value projections on Exhibit B, the Debtor projects that the value of its Cash Collateral will be maintained for the length of this case. The Secured Party will be in exactly the same or better position at the conclusion of the proposed period and are therefore adequately protected.

## CONCLUSION

For the foregoing reasons, the Debtor respectfully requests that the Court enter an order granting an expedited hearing, approving the use of cash collateral on an interim basis and authorizing the Debtor to use cash collateral on a final basis.

Dated: May 4, 2022                                   **THOMAS H. OLIVE LAW, P.A.**


By:  _/e/ Thomas H. Olive_____
Thomas H. Olive (ID# 14423X)
5270 W. 84th Street, Suite 300
Bloomington, MN  55437
Telephone:  (952) 831-0733

Attorneys for Debtor

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

_____

In re:

                                                                   Case No. 22-30690

Gleason's Gymnastic School, Inc.,

_____

**INTERIM ORDER AUTHORIZING USE OF CASH COLLATERAL**
**AND APPROVING STIPULATION REGARDING CASH COLLATERAL**

_____

This matter came before the undersigned on the Debtor's Motion for Expedited Relief; Interim Order Authorizing Use of Cash Collateral.  Appearances were noted on the record.  Based on the Motion, all the files, records and proceedings herein, the Court being fully advised in the premises,

**IT IS HEREBY ORDERED:**

1.      The Debtor's request for expedited relief is GRANTED.

2.      The Debtor is authorized, subject to the terms herein, to use cash collateral in which American Express National Bank and US Small Business Administration ("Secured Parties") have an interest through May 25, 2022.

3.      The Debtor's use of cash collateral is subject to the following terms:

      A.      The Debtor will use cash collateral to pay its ordinary and necessary business expenses and administrative expenses for the items and such use will not vary materially from that provided for in Exhibit D attached to the Motion, except for variations attributable to expenditures specifically authorized by Court Order.

      B.      The Debtor will grant the Secured Parties replacement liens, to the extent of the Debtor's use of cash collateral, in post-petition inventory, accounts, equipment and general tangibles, with such lien being of the same priority, dignity and effect as their respective pre-petition liens.  However, such replacement liens shall exclude all causes of action under Chapter 5 of Title 11 of the United State Code.

      C.      The Debtor will carry insurance on its assets.

   D.  The Debtor will provide the Secured Parties with such reports and documents as they many reasonably request.

   E.  The Debtor will afford the Secured Parties the right to inspect the Debtor's books and records and the right to inspect and appraise any part of their collateral at anytime during normal operating hours upon reasonable notice to the Debtor and its attorney.

  4.  The Court will hold a **final hearing on cash collateral on Wednesday May 25, 2022, at 1:00 p.m.** before the Honorable Katherine A. Constantine, in Courtroom 8 West, 300 South Fourth Street, Minneapolis, MN  55415.

      BY THE COURT

Dated: _____    _____

      Katherine A. Constantine
      United States Bankruptcy Judge